**In re COMMERCIAL TISSUE PRODUCTS.**

**No. GCA 97MDL1189 MMP.**

United States District Court,
N.D. Florida,
Gainesville Division.

July 22, 1998.

### ORDER GRANTING CONDITIONAL CLASS CERTIFICATION

PAUL, Senior District Judge.

This matter is before the court on the plaintiffs' motion for class certification, to which the defendants have responded. Having reviewed the pleadings and evidence, and having heard argument of counsel, the court concludes that this cause should proceed as a class action. The plaintiffs' motion is therefore GRANTED.

### I. Analysis

#### A. *The class*

Pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, the named plaintiffs have filed a motion to certify a class action on the behalf of:

> [A]ll Persons in the United States (excluding defendants and their co-conspirators; their respective parents, subsidiaries, and affiliates; and federal, state and local governmental entities and political subdivisions) who purchased Commercial Tissue Products directly from defendants, or their respective parents subsidiaries or affiliates, at any time during the Class Period.

#### B. *Rule 23*

Rule 23, in pertinent part, provides as follows:

> (a) **Prerequisites to a Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2)

there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

**(b) Class Actions Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

> \* \* \* \* \* \*

> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

The Rule is clear that Plaintiffs' action may be certified as a class action only if the court finds that it meets all requirements of Rule 23(a)(1)–(4)—"numerosity," "commonality," "typicality," and "adequacy"—as well as Rule 23(b)'s additional requirements. With regard to Rule 23(b), the plaintiffs must also show either (1) that common questions of law and fact predominate over individual ones such that class certification is the superior method for the fair and efficient adjudication of the controversy, or (2) respecting plaintiffs' requests for injunctive relief, that certification is appropriate for purposes of awarding or denying injunctive relief with respect to the class as a whole.

**C. *Preliminary Matters***

Before turning to the individual elements of Rule 23, we must begin with some basic principles of law that guide our discussion. First, in ruling upon a motion for class certification, the substantive allegations contained in plaintiffs' complaint are accepted as true. *In re Infant Formula Antitrust Litigation,* 1992 WL 503465 at \*3 (M.D.Fla. Jan. 13, 1992); *Shelter Realty Corp. v. Allied Maintenance Corp.,* 574 F.2d 656, 661 n. 15 (2nd Cir.1978). Moreover, the court will consider the allegations of the plaintiffs' consolidated amended complaint, rather than the allegations found in superseded pleadings, or pleadings of non-class members, to determine the nature of the claims the putative class plaintiffs are now presenting to this court.

The defendants, however, point out that several of the class plaintiffs and the State of Florida alleged in their original complaints that "at least some distributors—entities who would otherwise be class members—are actually co-conspirators who must be excluded from the class." The defendants argue that these initial pleadings should not be ignored, even though the consolidated amended complaint does not include allegations of distributor involvement. Defendants conclude that if distributors are involved, this case involves a vertical conspiracy like the one in the *Agricultural Chemicals* case, where this court found that too much "sweat and calculation" would be involved in determining who fit in the proposed class and who did not.

The defendants rely on footnote 5 of *White v. ARCO/Polymers, Inc.,* 720 F.2d 1391, 1396 n. 5 (5th Cir.1983) for the "unassailable legal point" that plaintiffs' earlier allegations stand as evidentiary admissions and cannot and must not be ignored. However, the defendants ignore the first clause of the sentence they cite from in footnote 5 in the *ARCO/Polymers.* The full sentence states the actual rule: "Admissions made in superseding pleadings are as a general rule considered to lose their binding force, and to have value only as evidentiary admissions."

*Id.* (citing 3 Moore's Federal Practice & Procedure ¶ 15.08[7] at 15–128 (1982)).

In the instant case, therefore, the plaintiffs are not bound by the allegations in the original complaints. Instead, they are bound by the allegations of the consolidated amended complaint, which are assumed to be true for class certification purposes. The practical effect of this is twofold. First, this order granting class certification is conditioned on the assumption that the plaintiffs may not now attempt to prove the conspiracy using evidence of involvement by distributors. If the plaintiffs at a future date attempt to offer proof that distributors were involved in the conspiracy, the court will re-examine this conditional grant of class certification. Second, the prior allegations of distributor involvement in the conspiracy stand as evidentiary admissions, which the defendants may offer to show that plaintiffs' theory of the conspiracy has changed. Thus, while the prior allegations do not bind the plaintiffs for class certification purposes, they may be used to contradict plaintiffs' theory of the case on the merits.

■ This brings us to the second guiding principle of law. When ruling upon a motion for class certification, the court does not delve into the merits of plaintiffs' substantive claims. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Transamerican Refining Corp. v. Dravo Corp.,* 130 F.R.D. 70, 76 (S.D.Tex. 1990); *In re Energy Systems Litig.,* 642 F.Supp. at 724; *In re Scientific Control Corp. Securities Litig.,* 71 F.R.D. 491, 505 (S.D.N.Y.1976); *Steinmetz v. Bache & Co.,* 71 F.R.D. 202, 204 (S.D.N.Y.1976). Likewise, a predetermination of the merits of the defense of the suit is also inappropriate. *Philadelphia Elec. Co. v. Anaconda American Brass, Co.,* 43 F.R.D. 452, 458 (E.D.Pa.1968); *Siegel v. Chicken Delight Inc.,* 271 F.Supp. 722, 726 (N.D.Cal.1967); 3B *Moore's Fed.Prac.* (MB)¶ 23.46. "The invitation to pre-try the case through the vehicle of this motion [class certification] must be respectfully declined...." *Siegel,* 271 F.Supp. at 726. Rather, the court's focus on a class certification motion is strictly upon the requirements as articulated in Rule 23.

### D. *Application of Rule 23*

Beginning with the elements of Rule 23(a)(1–4), the court now examines plaintiffs' motion and defendants' objections.

#### 1. *Rule 23(a)*

##### a. *Numerosity*

■ The requirement of numerosity is fulfilled when the potential class is so numerous that joinder of all members is impracticable. F.R.C.P. 23(a)(1). As noted above, numerosity is the only element of Rule 23(a) which is uncontested. In plaintiffs' complaint they allege that "[t]he Class, which numbers at least in the thousands, is so numerous and geographically dispersed that joinder of all Class members is impracticable." Accordingly, the element of numerosity is met in this case

##### b. *Commonality of Fact and Law*

The second step of Rule 23(a) application calls for an inquiry into whether there are questions of law or fact common to the class. The plaintiffs contend in their opening brief that defendants have stipulated to the existence of common questions of law and fact. However, defendants' Joint Reply Memorandum in Opposition to Plaintiff's Motion for Class Certification (doc. 109) does not indicate upon which elements of Rule 23 the defendants rely. Section III of defendants' memorandum, entitled "Plaintiffs Cannot Demonstrate Class-wide Impact" primarily attacks either the issue of whether common questions of fact and law predominate over individual under 23(b)(3), or the issue of typicality of the named plaintiffs. The defendants do not make the argument that no common questions exist at all, and the defendants do not expressly deny plaintiffs' assertion that they have stipulated to satisfaction of the commonality element of Rule 23(a).

■ In any event, the court concludes that commonality under 23(a) exists in this case. (Whether the common issues predominate will be discussed below). The complaints in this case allege a horizontal price-fixing conspiracy: that beginning in approximately 1993 the defendants, five of whom control

more than 75% of the domestic market, engaged in a conspiracy to fix, stabilize and maintain prices of commercial tissue products sold to direct purchasers throughout the United States. The questions of law and fact common to all the class members include (1) whether the defendants conspired to fix, raise, stabilize, or maintain prices for commercial tissue products; (2) the identity of each member of the alleged conspiracy; (3) the time period during which the conspiracy existed; (4) whether the defendants affirmatively concealed the conspiracy; (5) whether the conspiracy had an effect on prices paid by the class members for commercial tissue products during the class period; (6) the appropriate amount of damages; and (7) whether defendants' conspiracy is continuing so as to entitle the class to injunctive relief.

As the court stated in the Catfish Litigation case,

> Stated differently, all class members share a unity of interest in how the facts, as such will unfold at trial, will "fit" the law of a Sherman Act violation. Rule 23(a)(2) is satisfied since all the members of a class, as defined by named plaintiffs, have a potential interest in any proof of a concerted action, conspiracy, agreement, etc., with the aim of restraining trade in the catfish industry by fixing the prices of processed catfish and catfish products. Antitrust price fixing conspiracies, by their nature, raise common questions of fact and law about the existence, scope, and effect of the alleged conspiracy. *Coleman v. Cannon Oil Co.*, 141 F.R.D. 516, 521 (M.D.Ala. 1992); *Davis v. Northside Realty Associates, Inc.*, 95 F.R.D. 39, 43 (N.D.Ga.1982); *In re Corrugated Container Antitrust Litig.*, 80 F.R.D. 244, 247(S.D.Tex.1978); *In re Sugar Industry Antitrust Litig.*, 73 F.R.D. 322, 335 (E.D.Pa.1976). Plaintiffs in this case have alleged a single conspiracy spanning a period of approximately nine years by the major players in the catfish processing industry. If each class member proceeded individually, each would have to prove the existence and impact of the identical conspiracy to fix prices. Obviously, individual actions designed to prove identical elements would completely destroy any notions of judicial economy. Hence, there

are common issues of fact and law which favor class certification.

Whether these common issues predominate will be discussed below with regard to Rule 23(b)(3).

#### c. Typicality

■ A class action may be maintained only if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." F.R.C.P. 23(a)(3). Any discussion of "typicality" tends to considerably overlap with 23(b)(3) predominance, 23(a)(2) commonality, and 23(a)(4) adequacy of the class representatives. 3B *Moore's Fed.Prac.* (MB) ¶ 23.06–2. However, there are some considerations which are exclusively generic to 23(a)(3) typicality. The most prominent consideration is that there is an absence of an adverse interest between the representative parties and other members of the class. Certainly, typicality does not mean that the claims of class members must be identical. Beyond the absence of an adverse interest between the representatives and the class members, a claim by a representative party may be deemed "typical" if it is one which should be "reasonably expected" to be raised by members of the proposed class. *Technograph Printed Circuits, Ltd. v. Methode Electronics, Inc.*, 285 F.Supp. 714, 721 (N.D.Ill.1968). Furthermore, in instances wherein it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical of the absent class members. *In re Infant Formula*, 1992 WL 503465, at *5; *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir.1985); *Cumberland Farms Inc. v. Browning–Ferris Industries, Inc.*, 120 F.R.D. 642, 646 (E.D.Pa.1988); *In re U.S. Financial Securities Litig.*, 69 F.R.D. 24, 35 n. 12 (S.D.Cal. 1975).

■ In the instant case, the plaintiffs allege that the collusive price increases applied to both "into-stock" and "contract price sales." The "into-stock" price is the price at which the distributor purchases product from the manufacturer for general resale. Under "contract" pricing, the manufacturer will of-

fer to sell product to the distributor at a discount from the distributor's into-stock price for a specified period of time, provided the product is ultimately sold to a particular end user or class of end users. Based on the discounted price, the distributor sets his or her price to the end user. During the term of the contract, the distributor orders product, pays the manufacturer the full into-stock price, resells to the end user, and then (upon proof of sale to the contract end user) receives a credit or rebate from the manufacturer to reflect the agreed discount. Plaintiffs' Opening Brief on Class Certification (doc. 90–1), p. 11 n. 8. The conspiracy in this case is alleged to have affected prices on both types of sales. Therefore, any superficial distinctions between contract and into-stock sales do not represent a material distinction between class members.

The defendants, however, argue extensively that "[d]uring the Class Period, prices paid by different customers for the same product—prices which were never uniform in the first place—did not increase in lockstep," and that "actual transaction prices, which must be determined in order to establish any supracompetitive pricing by defendants, can only be calculated on a case-by-case basis." Defendants' Reply Memorandum on Class Certification (doc. 109), p. 15–17. The defendants then conclude that this situation creates "disabling manageability problems" for the plaintiffs, precluding a finding of typicality (as well as other elements, discussed below). *Id.* at 18.

The defendants' reliance on the pricing complexity of their industry is unavailing for several reasons. First, an industry cannot escape class action liability merely by creating an inscrutably complex pricing regime. As the court stated in *City of Philadelphia v. American Oil Co.,* 53 F.R.D. 45, 68 (D.N.J. 1971),

> This court is well aware of the complexity of gasoline pricing as compared to that of oddlot securities transactions and other cases where classes have been maintained under Rule 23(b)(3), and is also aware of the lack of economic data which would simplify the task of ascertaining damages. However, defendants should not·be permit-

ted to profit, if in fact they did violate the antitrust laws, because of the complexity of the pricing structure of gasoline.

In the instant case, if the commercial tissue paper companies did indeed violate the antitrust laws—a fact which remains to be proven, the defendants should not be permitted to escape class action liability because of the complexities of into-stock and contract and rebate pricing.

Second, courts in this and other circuits have upheld the certification of classes in industries which are easily as complex as the commercial tissue paper industry. *E.g., In re Corrugated Container Antitrust Litigation,* 80 F.R.D. 244 (S.D.Tex.1978); *In re Infant Formula Antitrust Litigation,* 1992 WL 503465 (N.D.Fla. Jan. 13, 1992); *In re NASDAQ Market–Makers Antitrust Litigation,* 169 F.R.D. 493 (S.D.N.Y.1996), and others. Nothing in the instant case distinguishes it from the myriad cases in which pricing complexity has been held to *not* undermine typicality. Accordingly, the court finds that the claims of the representative plaintiffs are typical of the claims of the putative class members.

### d. Adequacy of Representation

The same concerns that justify a finding of typicality also justify a finding of adequate representation. As discussed above, variations in pricing structures does not destroy adequacy of representation. Additionally, the court rejects the defendants' contention that a conflict of interest exists among the class. The defendants, relying upon the allegations of superseded pleadings, assert that the plaintiffs are going to try to prove that some distributors, who would otherwise be class members, were actually coconspirators with the manufacturers. Thus, the argument goes, the representative plaintiffs will try to prove that some of the members of the class they purport to represent were actually responsible for the conspiracy. This would surely be a conflict of interest. As discussed above, however, the plaintiffs are now bound by the allegations in their consolidated amended complaint, which does not include distributor involvement. The plaintiffs may not present evidence of distributor involve-

ment without this court re-examining the propriety of class certification. As such, there should not be any problem of the class representatives trying to prove that certain members of the class were actually co-conspirators. As a result, there should be no conflict of interest over that issue.

Also, as noted in plaintiffs' opening brief, plaintiffs' lead counsel have participated successfully in several complex and high-profile antitrust cases, including the Infant Formula and Carbon Dioxide antitrust cases. The court concludes that they are competent and experienced in class action antitrust litigation. Thus, for the above reasons, the court finds that plaintiffs meet the requirement of adequate representation.

### 2. Rule 23(b)

 All four prerequisites of Rule 23(a) are satisfied in this case. Consequently, the court's attention turns to Rule 23(b) for an assessment of the criteria which is set forth on the maintainability of class actions. A price-fixing antitrust conspiracy model is generally regarded as well suited for class treatment. 3B *Moore's Fed.Prac.* (MB) ¶ 23.46. The guiding principle for b(3) certification is that the interests of the parties can best be served by settling their differences in one single action. 7A Charles A. Wright & Arthur R. Miller, Fed.Prac. and Proc. § 1777 (1986). However, a mere charge of conspiracy does not mean that common questions predominate, or that product or market diversity, or dissimilar treatment could render a class action unmanageable. The suitability for Rule 23 certification is, by design and necessity, a fact sensitive process for each case.

The heart of defendants' argument is that the individual questions of fact and law predominate over the general questions of law and fact because the price paid by each distributor was determined through an elaborate system of individualized negotiations, contracts and rebates. To determine any classwide impact, argue the defendants, you must first prove the impact, if any, on each of the class members. Because pricing in the industry is allegedly so individualized, the plaintiffs will be unable to show any consis-

tent classwide relationship between the acts of the defendants and the prices paid by class members. Or at the very least, argue the defendants, proving such impact will require infinite mini-trials concerning the price actually paid by each class member.

While defendants' argument is attractive at first blush, closer analysis reveals its flaws. First, many cases have held that even if there is considerable individual variety in pricing because of individual price negotiations, class plaintiffs may succeed in proving classwide impact by showing that the minimum baseline for beginning negotiations, or the range of prices which resulted from negotiation, was artificially raised (or slowed in its descent) by the collusive actions of the defendants. *See, e.g., In re Catfish Antitrust Litigation,* 826 F.Supp. 1019 (N.D.Miss. 1993); *In re Infant Formula Antitrust Litigation,* 1992 WL 503465, at *5 (Jan. 13, 1992). ("Contentions of infinite diversity of product, marketing practices, and pricing have been made in numerous cases and rejected. Courts have consistently found the conspiracy issue the overriding, predominant question"); *In re Domestic Air Transp.,* 137 F.R.D. 677, 689 (N.D.Ga.1991) (inflated fares resulted in artificial "base" price which became benchmark for discounted or negotiated fares); *Hedges Enterprises, Inc. v. Continental Group, Inc.,* 81 F.R.D. 461, 475 (E.D.Pa.1979) (despite negotiated or discounted prices, artificial minimum became "base" price). In the instant case, as in the *Corrugated Carton, NASDAQ, Plywood, Glassine* and *Small Bags* cases, the plaintiffs allege that any individual price negotiations for commercial tissue products began from price lists or guidelines which plaintiffs allege were artificially and unlawfully inflated by the conspiracy. Thus defendants' argument that diversity of pricing destroys predominance is unavailing.

Defendants, and particularly defendants' experts, complain that plaintiffs have failed to show that they experienced lock-step price increases through empirical evidence. Because the plaintiffs have offered no empirical evidence of the prices they actually paid, argue the defendants, the plaintiffs cannot refute the findings of defendants' experts

that "during the class period, prices did not move in any consistent or uniform way either across products or among customers purchasing a single product." *Supplemental Affidavit of Todd Morrison*, p. 7. Thus, conclude the experts, plaintiffs cannot satisfy the element of showing classwide impact.

It is particularly important at this point to focus on the task before the court in considering a motion for class certification. The court is not to consider the merits of the claim; that is, whether the plaintiffs will truly be able to show classwide impact or lock step price increases. Instead, the court is only to consider whether the type of proof offered by plaintiffs to attempt to prove injury to the class members will be of a classwide character such that class action treatment of the case will be superior to myriad individual actions. The court in the *In re Potash Antritrust Litigation*, stated this rule succinctly:

> This case presents the familiar "battle of the experts." The certification stage of this litigation is not, however, the proper forum in which to resolve this battle. Faced with conflicting expert testimony regarding the complexity, diversity and various pricing strategies in the catfish market, the court in *In re Catfish Antitrust Litigation* aptly explained that "[w]hether or not plaintiffs' expert is correct in his assessment of common impact/injury is for the trier of fact to decide, at the proper time." 826 F.Supp. at 1042.

159 F.R.D. 682, 697 (D.Minn.1995).

In the instant case, the court similarly declines to engage in a merit-based battle of the experts. For now, the court is persuaded that for the purposes of a class certification motion, plaintiffs have made a threshold showing that, if they prove a price-fixing conspiracy, the proof they will offer to show injury will be sufficiently generalized in nature that the class action will provide immeasurable savings of time and effort. *Id.* ("Without trenching on the merits, in considering a class certification motion, a court must consider only whether plaintiffs have made a threshold showing that what proof they will offer will be sufficiently generalized in nature that ... the class action will pro-

vide a tremendous savings of time and effort." (internal quotes omitted)).

Moreover, the court finds that the methods suggested by Dr. Asher to determine damages are not so insubstantial and illusive as to amount to no method at all. While defendant's experts are correct that the damage amounts are individualized and will vary among plaintiffs, individual questions of damages are often encountered in antitrust actions, and they are rarely a barrier to certification. *In re Catfish Antitrust Litigation*, 826 F.Supp. 1019, 1043; *In re Workers' Compensation*, 130 F.R.D. 99, 110 (D.Minn.1990).

> The difficulties or challenges which may face the court in the damages phase of this litigation, should it proceed that far, are frail obstacles to certification when measured against the substantial benefits of judicial economy achieved by class treatment of the predominating, common issues.

*Catfish Litigation*, 826 F.Supp. at 1043.

For the above reasons, the court concludes that the common issues of law and fact predominate over individual issues and that proceeding as a class action in this matter will be far superior to myriad individual actions. Accordingly, it is hereby

**ORDERED AND ADJUDGED:**

1. Plaintiffs' Motion for Class Certification (doc. 90–1) is GRANTED.

2. Plaintiffs' Motion to Strike Declarations (doc. 111) is DENIED.