**In re TERAZOSIN HYDROCHLORIDE ANTITRUST LITIGATION.**

No. 99–MDL–1317.

United States District Court,
S.D. Florida,
Southern Division.

Sept. 20, 2001.

Order amending class certification order Sept. 28, 2001.

Richard B. Drubel, Boies, Schiller & Flexner, L.L.P., Hanover, NH, Counsel for Sherman Act Class Plaintiffs.

Barry S. Taus, Garwin, Bronzaft et al., New York City, for Sherman Act Class Plaintiffs.

Scott E. Perwin, Kenny Nachwalter Seymour et al., Miami, FL, for Walgreen Co.

David S. Mandel, Mandel & McAliley, Miami, FL, Local Counsel for Char–Mar Pharm., Inc.

Daniel Small, Cohen, Milstein, Hausfeld et al., Washington, DC, for Indirect Purchaser Plaintiffs.

Jeffrey I. Weinberger, Munger, Tolles & Olson LLP, Los Angeles, CA, for Abbott Labs.

Gerson A. Zweifach, Williams & Connolly LLP, Washington, DC, for Zenith Goldline Pharms.

Daniel Berger, Berger & Montague, P.C., Philadelphia, PA, for Valley Drug Co.

Mark S. Armstrong, Calvin, Richardson, Verner et al., Houston, TX, for Louisiana Wholesale Drug Co.

Steve D. Shadowen, Schnader Harrison et al., Harrisburg, PA, for Rite Aid Corp. & CVS Meridian, Inc.

Robert C. Gilbert, Robert C. Gilbert, P.A, Coral Gables, FL, for Indirect Purchaser Plaintiffs.

Stephen Lowey, Lowey Dannenberg Bemporad et al., White Plains, NY, for Indirect Purchaser Plaintiffs.

Wayne A. Cross, Dewey Ballantine, LLP, New York City, for Geneva Pharms.

Mitchell W. Berger, Berger Davis & Singerman, Fort Lauderdale, FL, for Sherman Act Class Plaintiffs.

## ORDER GRANTING PLAINTIFFS' CONSOLIDATED MOTION FOR CLASS CERTIFICATION

SEITZ, District Judge.

Plaintiffs Louisiana Wholesale Drug Co. ["Louisiana Wholesale"] and Valley Drug Co. ["Valley Drug"], who purchased the prescription drug Hytrin containing terazosin hydrochloride directly from Defendant Abbott Laboratories ["Abbott"], jointly request that the Court certify their proposed class of direct purchasers pursuing antitrust claims under *Federal Rule of Civil Procedure* 23. (*See* Pls.' Mots., Civ. No. 98–3125 [D.E. No. 130], Civ. No. 99–7143 [D.E. No. 38]; Compl., Civ. No. 99–3125, at ¶7; Compl., Civ. No. 99–7143, at ¶4.) As the class action mechanism offers the most efficient method for adjudicating the direct purchasers' suits, the Court will grant their motion and certify the class.

## BACKGROUND

In late March and early April, 1998, Abbott entered into contracts with generic drug makers Geneva Pharmaceuticals, Inc. ["Geneva"], and Zenith Goldline Pharmaceuticals, Inc. ["Zenith"], to delay competition in its lucrative market for "Hytrin," the only terazosin hydrochloride drug available in the United States for the treatment of hyperten-

sion or enlarged prostate until August, 1999.[1] Thereafter, Louisiana Wholesale and Valley Drug [collectively, "plaintiffs"] filed separate class action complaints alleging that the defendants' agreements forestalled the introduction of generic terazosin hydrochloride drugs and thereby injured them in "business or property" in violation of section four of the Clayton Act, 15 U.S.C. § 15, as well as section one of the Sherman Antitrust Act, 15 U.S.C. § 1. (*See* Compl., Civ. No. 98–3125, at ¶¶ 5, 48–54; Compl., Civ. No. 99–7143, at ¶¶ 1, 45–52.) In December, 2000, this Court entered partial summary judgment for the direct purchasers, concluding that the defendants' accords were patently anti-competitive, unreasonable, and illegal *per se* under the Sherman Act. *See In re Terazosin HCl Antitrust Litig. I*, slip. op. at 11–12, 18–19. Of course, the direct purchasers must still prove that those accords affected them, and to promote that objective, they have jointly proposed that the Court adjudicate their lawsuits as a class action.

## DISCUSSION

Invoking the interests of judicial economy, the plaintiffs have moved to certify the following class: "All persons who have directly purchased terazosin hydrochloride from Abbott at any time during the period March 31, 1998, through the time when the illegal agreements have terminated." (Pls.' Mem., Civ. No. 98–3125 [D.E. No. 130] at 10; Pls.' Reply, Civ. No. 98–3125, at 6.) The defendants contend, however, that "class treatment is far from superior under the circumstances of this case." (Defs.' Opp'n, Civ. No. 98–3125 [D.E. No. 239] at 56.) As the plaintiffs bear the burden of satisfying the requirements for a class action under *Federal Rule of Civil Procedure* 23, subsections (a) and (b)(3), see *Gilchrist v. Bolger*, 733 F.2d 1551, 1556 (11th Cir.1984), the Court will address those provisions in turn.

**1.** *See In re Terazosin Hydrochloride Antitrust Litig.*, Civ. No. 99–MDL–1317, slip. op. at 8–11 (S.D.Fla. Dec. 13, 2000) ["*In re Terazosin HCl Antitrust Litig. I*"] (recounting terms of agreements, which sought to preclude Geneva and Zenith from marketing generic Hytrin for some time and removed the risk that they would buy or

### 1. Plaintiffs Have Satisfied the Prerequisites of *Federal Rule* 23(a)

At the outset, the plaintiffs must demonstrate that the preconditions for a class action are present in this case. In short, they must show that a sizable number of plaintiffs are raising common questions of law or fact, and that one or several of those plaintiffs raising these questions can fairly represent the rest. The defendants have not seriously contested these issues; the record clearly favors the plaintiffs.

#### A. Numerosity

■ The first prerequisite for maintaining a class action under *Federal Rule* 23(a) is that the class is so large that joinder is impracticable. FED. R. CIV. P. 23(a)(1). To meet this requirement, plaintiffs need not prove the exact size of the proposed class, but they must demonstrate that the number is exceedingly large, rendering joinder impracticable. *See, e.g., In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524, 529 (M.D.Fla.1996).

■ Numerosity is practically uncontested in this case. Louisiana Wholesale and Valley Drug have obtained sales records from Abbott as well as expert testimony indicating that "the number of direct purchasers is in the hundreds, if not thousands." (Pls.' Mem. at 14 (citations omitted).) None of the defendants have challenged the plaintiffs' assertion that there are more than a thousand putative class members. (*See, e.g.,* Tr., Sept. 10, 2001.) The identities of these direct purchasers may be "ascertained through reasonable effort" through further examination of Abbott's business records. *Earnest v. General Motors Corp.*, 923 F.Supp. 1469, 1473 (N.D.Ala.1996); *see In re Infant Formula Antitrust Litig.*, MDL No. 878, 1992 WL 503465, at *3 (N.D.Fla. Jan.13, 1992). Hence, the proposed class is sufficiently numerous that joinder is impractical. *See Kreuzfeld A.G. v. Carnehammar*, 138 F.R.D.

sell the right to introduce such generic drugs in the interim, among other things); *see also In re Terazosin Hydrochloride Antitrust Litig.*, Civ. No. 99–MDL–1317, slip. op. at 1–2 (S.D.Fla. July 2, 2001) ["*In re Terazosin HCl Antitrust Litig. II*"] (reporting that defendants' agreements terminated on August 12, 1999).

594, 599 (S.D.Fla.1991) (certifying class of 130 investors); *In re Playmobil Antitrust Litig.*, 35 F.Supp.2d 231, 239 (E.D.N.Y.1998) ("A finding of numerosity ... is especially appropriate in antitrust actions brought under *Rule* 23(b)(3)").

### B. Commonality

■ The second prerequisite for maintaining a class action under *Federal Rule* 23(a) is that "there are questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). The plaintiffs have identified several common questions of law or fact, including the legality of the defendants' agreements, whether those agreements delayed the introduction of generic terazosin hydrochloride drugs in the United States, whether the direct purchasers were harmed as a result, and what form of relief, if any, should be accorded to direct purchasers. (*See* Pls.' Mem. at 15.) The Court has already visited some of these questions. *See In re Terazosin HCl Antitrust Litig. II*, slip. op. at 3–4 (discussing relief available to direct and indirect purchasers under federal law); *In re Terazosin HCl Antitrust Litig. I*, slip. op. at 11–12, 18–19 (concluding that defendants' horizontal market allocation accords were illegal *per se* under the Sherman Act). Other common questions will be ripe at the close of discovery. Recalling that "a single common question is sufficient to satisfy *Rule* 23(a)(2)," *Powers v. Stuart–James Co.*, 707 F.Supp. 499, 502 (M.D.Fla.1989), commonality is clearly present in this case. *See In re Carbon Dioxide Antitrust Litig.*, 149 F.R.D. 229, 232 (M.D.Fla.1993) ("Plaintiffs allege a horizontal conspiracy to stabilize prices in a single, fungible product .... [b]y their nature, antitrust conspiracy actions such as this one involve common questions of law or fact.")

**2.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), the Court of Appeals for the Eleventh Circuit adopted as binding precedent all decisions that the former Court of Appeals for the Fifth Circuit rendered before October 1, 1981.

**3.** *Kennedy v. Tallant*, 710 F.2d 711, 717 (11th Cir.1983). Variations in the actual amount of injury sustained by individual class members do not alter this conclusion. *See Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir.1985) (recognizing that a "strong similarity of legal theories

(citations omitted); *see also Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 319 n. 22 (5th Cir.1978).[2]

### C. Typicality

■ The third prerequisite for class certification under *Federal Rule* 23(a) is that the representative parties' claims "are typical of the claims ... of the class." FED. R. CIV. P. 23(a)(3). Typicality exists "if the claims ... of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir.1984); *see In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 698 (N.D.Ga.1991).

In the case at hand, all proposed class members are pursuing the same legal remedy based on the same conduct-the defendants' agreements or acts to forestall competition in the domestic market for terazosin hydrochloride drugs. (*See* Compl., Civ. No. 98–3125, at ¶ 5, 48–54; Compl., Civ. No. 99–7143, at ¶ 1, 45–52.) Whereas the plaintiffs seek to prove that the defendants "committed the same unlawful acts in the same method against an entire class," the typicality requirement is satisfied.[3]

### D. Adequacy

■ The final prerequisite for class certification under *Federal Rule* 23(a) is that "the representative parties will fairly and adequately protect the interests of the class," FED. R. CIV. P. 23(a)(4), meaning that the named plaintiffs' interests are not antagonistic to those of the class and that their attorneys are qualified, experienced, and able to conduct the litigation. *See Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th

will satisfy the typicality requirement despite substantial factual differences"), *overruled on other grounds by Green v. Mansour*, 474 U.S. 64, 67, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985); *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. at 698 (noting that *Federal Rule* 23(a)(3) may be satisfied "even though ... there is a disparity in the damages claimed by the representative parties and the other members of the class"); *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 691 (D.Minn.1995) (same).

Cir.1987). The defendants have not reported any actual or apparent conflicts of interest between Louisiana Wholesale or Valley Drug and the proposed class, and it appears that all potential class members are aligned in interest against the defendants. The Court has considerable flexibility to deal with any conflicts that may arise. *See, e.g., In re NASDAQ Market–Makers Sec. Litig.,* 169 F.R.D. 493, 513 (S.D.N.Y.1997). Further, there is no serious dispute concerning the qualifications of the class counsel; these attorneys are familiar to the Court and the record reflects their experience in similar actions. (*See* Pls.' Mem., Ex. E.) The named plaintiffs and their counsel possess the necessary incentive and qualifications to serve as class representatives and counsel. *See In re Disposable Contact Lens Antitrust Litig.,* 170 F.R.D. at 532. As the plaintiffs have met the prerequisites to a class action under *Federal Rule* 23(a), the Court must also consider the factors delineated in *Federal Rule* 23(b)(3) to determine whether the plaintiffs' claims should be heard as a class.

## 2. Plaintiffs' Proposed Class Action Provides a Superior Mechanism for Adjudicating Integral, Common Questions of Fact and Law

To pursue a class action under *Federal Rule of Civil Procedure* 23(b)(3), the plaintiffs must demonstrate that common questions of law or fact predominate over any individual issues, and that a class action is superior to other methods of adjudicating the direct purchasers' claims. FED. R. CIV. P. 23(b)(3). Scrutinizing the evidence that plaintiffs propose to use in proving their claims without delving into the merits of those claims,[4] the Court is satisfied that plaintiffs have met this burden.

### A. Common Questions Predominate

■ Common questions of law or fact predominate over individualized questions when "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, ... predominate over those issues that are subject only to individualized proof." *Rutstein v. Avis Rent–A–Car Sys., Inc.,* 211 F.3d 1228, 1233 (11th Cir.2000) (citation omitted). By examining the claims of the proposed class, and determining whether the resolution of class-wide issues will have a substantial impact in each class member's underlying case, the Court can assess whether common questions predominate over individual ones. *See id.* at 1233–34 (citations omitted).

■ The proposed class seeks treble damages under section four of the Clayton Act for anti-competitive behavior prohibited by the Sherman Act. Their claims will require proof that the defendants violated the antitrust laws; that the alleged violations caused some injury to the plaintiffs' "business or property"; and that the extent of the injury "can be quantified with requisite precision." *In re Domestic Air Transp. Antitrust Litig.,* 137 F.R.D. at 685; *see McGuire Oil Co. v. Mapco, Inc.,* 958 F.2d 1552, 1557–58 (11th Cir.1992), *modified on other grounds,* 986 F.2d 444 (11th Cir.1993). Contrary to the defendants' assertions, common or "generalized" proof will predominate at trial with respect to these three essential elements of the plaintiffs' antitrust claim.

### 1. Common Proof of Conspiracy

The existence of the defendants' conspiracy has been shown by common proof, in the form of the defendants' written, covert agreements to stifle domestic competition for the sale of terazosin hydrochloride drugs. *See In re Terazosin HCl Antitrust Litig. I,* slip op. at 8–11. The plaintiffs did not have to rely on evidence of the conduct of individual class members to establish this conspiracy. No one contends that the defendants' comprehensive agreements made cheaper gener-

---

4. This *Order* expresses no opinion on the merit of the plaintiffs' claims. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) ("A *Rule* 23 determination is wholly procedural and has nothing to do with whether a plaintiff will ultimately prevail ...."); *In re Polypropylene Carpet Antitrust Litig.,* 178 F.R.D. 603, 611 (N.D.Ga.1997) (noting that Court must examine "whether sufficient evidence exists to reasonably conclude that Plaintiffs may proceed in the manner proposed, not whether the evidence can withstand any and all factual challenges leveled by Defendants").

ic drugs available in the United States to some class members, but not others. *See In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. at 619; *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. at 688 ("Resolution of whether the alleged conspiracy presents common questions capable of common proof depends upon ... [the] defendants' challenged behavior: what defendants said or did.").

By addressing the legality of the defendants' agreements simultaneously with respect to all direct purchasers, the Court conserved its resources as well as those of the parties. Although the Court does not intend to revisit this issue, any reconsideration would similarly benefit from class treatment. Common questions predominate with regard to the defendants' acts, and the defendants cannot dispute this point.

### 2. Common Proof of Antitrust Impact

#### i. Plaintiffs Have Secured Generalized Evidence to Prove Impact

The plaintiffs have also shown that they can use common evidence to prove the impact of the defendants' conspiracy with a fair degree of certainty as to each member of the proposed class without resorting to lengthy individualized examinations. Such individualized examinations "will relate to the quantum of damages, not the fact of injury." *See In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 307 (E.D.Mich.2001) ["*Cardizem III*"].[5] According to the plaintiffs, the defen-

dants' agreements injured them by depriving direct purchasers of the savings realized when cheaper equivalents are available (frequently referred to as the "generic substitution" effect) and by artificially maintaining a higher price for Hytrin. (*E.g.*, Pls. Mem. at 20–24; Pls. Reply at 5–6.) Both of these propositions may be proven with evidence common to the proposed class members.

All class members may prove the impact of delayed generic substitution with common evidence. Expert research and testimony illustrate that, historically, FDA-approved generic drugs are at least 30% less expensive than brand name drugs, and typically capture a large share of the market.[6] Abbott and Geneva conducted internal surveys confirming that generic terazosin hydrochloride would follow this trend. (*See* Pls' Reply Exs. 1–2, 6, 18.) There is record evidence to show that the direct purchasers would have purchased generic terazosin hydrochloride at lower prices before August 1999, if the defendants had not conspired to restrain generic competition. (*See* Schondelmeyer Decl. ¶¶ 46–49.) Coupled with market data compiled after the introduction of generic terazosin hydrochloride drugs in America and the defendants' admissions in these consolidated proceedings,[7] among other evidence, each direct purchaser may demonstrate that the defendants' accords deprived them of savings and injured them in business or property. (*See id.* ¶ 46–49, 55; Pls.' Reply at 7.)

---

5. Cited here and in previous decisions of this Court, the *Cardizem CD* case concerns an alleged agreement between drug manufacturers to restrain generic competition for the United States market for Cardizem CD. *See In re Cardizem CD Antitrust Litig.*, 105 F.Supp.2d 618 (E.D.Mich. 2000) ["*Cardizem I*"]; *In re Cardizem CD Antitrust Litig.*, 105 F.Supp.2d 682 (E.D.Mich.2000) ["*Cardizem II*"]. As one of the class representatives in that action, Louisiana Wholesale has advanced contentions and testimony similar, if not identical, to the contentions and expert testimony present in this case. *See Cardizem III*, 200 F.R.D. at 301, 308, 322.

6. (*See* Pls. Reply at 6–8; Pls.' Mem. Ex. C (Schondelmeyer Decl. ¶¶ 28–36, 42); Pls.' Mem. Ex. D (Solow Decl. ¶¶ 12–14).) The plaintiffs have retained Dr. Stephen W. Schondelmeyer ["Schondelmeyer"], professor of pharmacy management and economics at the University of

Minnesota, and Dr. John Solow ["Solow"], associate professor of economics at the University of Iowa, as experts in this matter as well as the *Cardizem CD* case. Both Dr. Schondelmeyer and Dr. Solow are credible expert witnesses based on their background, experience, and review of pertinent materials. As previously noted, however, the "*weight* to be given to [their] testimony and its effect is for the fact finder in assessing the merits of plaintiffs' claims at a later date." *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. at 692 (emphasis added); *see supra* note 4.

7. (*See* Defs.' Opp'n at 29 ("if generic terazosin had been launched sooner it would have cost less than branded Hytrin and taken sales away from it"); *see also id.* at 20 (acknowledging that, within nine months of its introduction, generic terazosin hydrochloride accounted for 70% of all terazosin hydrochloride sales).)

Similarly, all class members may rely on common evidence in demonstrating the impact of the defendants' accords in maintaining artificially high Hytrin prices. Abbott's recorded pricing guidelines identify categories of direct purchasers who would be eligible for discounts once generic terazosin hydrochloride was introduced. (*See* Pls.' Reply at 9; *see also* Defs.' Opp'n at 28 (acknowledging that Abbott increased discounts to identifiable direct purchasers following generic entry).) The plaintiffs obtained the testimony of Joseph Fiske, Abbott's director of pricing and contracting for pharmaceuticals, to confirm Abbott's discount policies and record-keeping practices. (*See* Pls.' Reply Ex. 7, at 82–83, 122–23.) Again, common proof exists to establish the impact of the defendants' conspiracies.

### ii. Defendants' Arguments Concerning Plaintiffs' Common Proof of Impact are Unpersuasive

Abbott, Geneva, and Zenith attempt to draw attention away from the fact that there is generalized evidence of overcharges and lost discounts by attacking the plaintiffs' theory of the case and arguing, in essence, that the plaintiffs' evidence is insufficient or entitled to no weight. These arguments are improper at the class certification stage. "Plaintiffs must show that antitrust impact *can be proven* with common evidence on a classwide basis; [they] need not show antitrust impact *in fact occurred* on a classwide basis." *In re Polypropylene Carpet Antitrust Litig.,* 178 F.R.D. at 618 (emphasis added).

Contrary to the defendants' view, the plaintiffs are entitled to seek damages quantified in terms of an overcharge to direct purchasers. The defendants strenuously argue that "the conduct alleged by [the] plaintiffs requires [an individualized] 'lost profits' approach to impact and damages." (Def.'s Opp'n at 23.)[8] However, the plaintiffs are the masters of their complaint. *E.g., The Fair v. Kohler Die & Specialty Co.,* 228 U.S. 22, 25, 33 S.Ct. 410, 57 L.Ed. 716 (1913). Unlike generic drug manufacturers or competitors illegally excluded from the market, direct purchasers are injured, first and foremost, by paying more for the relevant product. *See Cardizem III,* 200 F.R.D. at 309. They have the right to pursue damages measured in terms of an overcharge under section four of the Clayton Act. *See Illinois Brick Co. v. Illinois,* 431 U.S. 720, 729, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) ("the overcharged direct purchaser, and not others in the chain of manufacture or distribution, is the party 'injured in his business or property' within the meaning of [that] section"). The plaintiffs' capacity to "pass on" any overcharge to other purchasers, and therefore receive a "windfall" recovery in these proceedings, is irrelevant. Direct purchasers may "recover ... the full amount of the overcharge." *Id.* at 730, 97 S.Ct. 2061 (declaring that "one plaintiff (the direct purchaser) is entitled to full recovery") (parenthesis in original); *see Cardizem III,* 200 F.R.D. at 316 (citations omitted).

Although the defendants disagree, comparing the prices of a branded drug to those of its generic equivalent to determine whether agreements to delay generic entry resulted in an "overcharge" is an appropriate way to assess impact. *See* 2 PHILLIP E. AREEDA ET AL., ANTITRUST LAW ¶ 394b, at 529 (1998) ["AREEDA"] ("nearly all plaintiffs claim damages on the basis of an overcharge calculation").[9] All of the defendants

---

**8.** The phrase "lost profits" refers to additional profits that a direct purchaser would have made in the absence of the defendants' illegal agreements. *See Cardizem III,* 200 F.R.D. at 308 n. 8 (citation omitted). As one might expect, the calculation of lost profits depends almost entirely on facts peculiar to each direct purchaser.

**9.** The defendants vehemently maintain that it is "absurd" for direct purchasers in antitrust cases involving the pharmaceutical industry to measure an overcharge by examining the costs of buying a branded drug as compared to its gener-

ic equivalent because they are "different" products. (*See, e.g.,* Def.'s Opp'n at 10.) They advance a number of interesting but unhelpful analogies to make this point. *See id.* (drawing analogy to automobile industry that implicitly assumes that Chevrolets are "generic" products or perfect substitutes for Mercedes); *id.* at 12 (making similarly inapt comparison between Coca–Cola and Royal Crown Cola); Tr., Jan. 19, 2001 (arguing that Diet Coke and Diet Pepsi are "bioequivalent but different products," notwithstanding the fact that neither is a generic product or used principally for its therapeutic effect).

measured the economic impact of their accords by comparing anticipated prices for branded and generic terazosin hydrochloride. (*See* Pls.' Reply Exs. 1–2, 6(3)–6(8), 18.)

Abbott, Geneva, and Zenith also argue that individual issues will predominate with respect to impact because their accords did not uniformly affect all direct purchasers. Specifically, they assert that: (1) some class members "would not have switched a substantial portion of [their] purchases from branded Hytrin to generic terazosin [hydrochloride]," (Defs. Opp'n at 25); (2) "Abbott raised prices substantially after generic [entry]," (*id.* at 27); and (3) "historical evidence . . . says nothing about the experiences of individual class members." (*Id.* at 30.) Although couched in terms relevant to class certification, the defendants' assertions relate chiefly to the calculation of damages at trial, not whether the plaintiffs have secured general evidence of impact sufficient to justify a class action. *See In re Potash Antitrust Litig.*, 159 F.R.D. at 694. These bare allegations do not render class treatment inappropriate. *See Cardizem III*, 200 F.R.D. at 316–21 (rejecting defendants' contentions that variations in pricing, volume of sales, or generic substitution rates were relevant to impact or would predominate over common questions of law or fact).

> They also point to numerous superficial differences between branded and generic Hytrin: varying chemical structures, different inactive ingredients, different delivery mechanisms, differences in color, shape, or labeling, brand identity and the concomitant willingness of some consumers to pay more for the brand name. (*See* Tr., Jan. 19, 2001.)
>
> Terazosin hydrochloride is the relevant subject for purposes of measuring the alleged overcharge. Abbott developed, marketed, and sold that substance for its therapeutic effects under the brand name "Hytrin," and the U.S. Food and Drug Administration ["FDA"] confirmed generic terazosin hydrochloride as a bioequivalent, therapeutic substitute. (*See, e.g.*, Pls.' Reply at 22.) American consumers ingested it as such. *See supra* note 7. Even the defendants' expert, Dr. Richard Rozek of National Economic Research Associates, Inc., has characterized an FDA-approved generic drug as a "perfect substitute." (*See* Pls.' Reply, Ex. 3 at 27.) On the present record, the Court does not perceive a material difference between branded and generic terazosin hydrochloride. *See Cardizem III*, 200 F.R.D. at 311; *In re Domestic Air Transp. Antitrust Li-*

The plaintiffs have shown that there is common evidence to prove impact with a fair degree of certainty as to the proposed class members. They are not required to prove at present that every class member was actually impacted.[10] The plaintiffs intend to establish the impact of the defendants' accords with proof common to the class, consisting of the defendants' sales records, pricing guidelines, and studies, as well as market data and expert testimony and research. *See supra* page 556. This evidence indicates that the defendants' accords inflated the prices for terazosin hydrochloride paid by the class.[11] Although the defendants' expert sharply criticizes this conclusion and the analyses of the plaintiffs' experts, this is not a dispute for the Court to resolve. *See supra* note 6. It appears that common questions predominate on the impact issue. *See In re Potash Antitrust Litig.*, 159 F.R.D. at 697.

### 3. Common Proof for Computation of Damages

Lastly, the plaintiffs have shown that computation of damages is susceptible to common proof. "Once an antitrust violation and its causal relation to plaintiff's injury have been established, the burden of proving the amount of damages is much less severe." *Graphic Products Distribs., Inc. v. Itek Corp.*, 717 F.2d 1560, 1579 (11th Cir.1983).

*tig.*, 137 F.R.D. at 687–88 (concluding that "air passenger service [is] a standardized product" because "[a]ll airline service is homogeneous in that it performs substantially the same function, in substantially the same manner, and for the same purpose").

10. *See In re Auction Houses Antitrust Litig.*, 193 F.R.D. 162, 166 (S.D.N.Y.2000); *In re NASDAQ Market–Makers Antitrust Litig.*, 169 F.R.D. at 523 ("[e]ven if it could be shown that some individual class members were not injured, class certification, nevertheless, is appropriate where the antitrust violation has caused widespread injury to the class").

11. The defendants have not demonstrated that any direct purchaser used a pre-existing contract for a fixed quantity of goods to "pass on" an overcharge to an indirect purchaser. (*See* Pls.' Reply at 12–14.) It appears, however, that the proposed class includes specialty distributors and repackagers that did not purchase generic drugs. The Court will exclude these direct purchasers from the class definition. (*See* Defs.' Opp'n at 25; Pls.' Reply at 12.)

The plaintiffs need only introduce evidence to allow a jury to render "a just and reasonable estimate of damage based on the relevant evidence." *Lehrman v. Gulf Oil Corp.*, 464 F.2d 26, 44 (5th Cir.1972) (citation omitted); *see Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931).

Although "[t]he absence of a formulaic method by which to calculate damages would not be a sufficient reason to deny class certification," *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. at 692, the plaintiffs' experts have devised the following algebraic formula for the computation of class members' overcharge damages:

> First, the amount of Hytrin purchased from Abbott by a class member is multiplied by the expected substitution rate of generic terazosin [hydrochloride], to yield an estimate of the amount of generic that would have been purchased had it been available. Second, the amount of generic [drugs] that would have been purchased is multiplied by the expected price difference between Hytrin and the generic [substitute]. The result is the total amount of overcharge to that class member.

(Pls.' Reply at 24 (citing Schondelmeyer Decl. ¶ 56.); Pls. Mem. at 25 (citing Solow Decl. ¶ 21–22); *see also* Solow Decl. ¶ 23 (proposing similar formula to calculate class members' lost discounts).)

The defendants assert that individual questions predominate with respect to the amount of damages because, under the plaintiffs' formula, "there is no way to avoid examining the individual circumstances of each member of the class for purposes of estimating damages." (Defs.' Opp'n at 52.) This point does not preclude a class action. If the direct purchasers prevail, some form of individualized inquiry will be needed to determine their respective damages. (*See* Pls.' Mem. at 24; Defs.' Opp'n at 31); *see also In re Catfish Antitrust Litig.*, 826 F.Supp. 1019, 1043

(N.D.Miss.1993) (recognizing "obvious" proposition that "damage amounts are individualized and will vary among plaintiffs").

Under the proposed formula, numeric variables and final damage verdicts may vary with respect to each class member, but that will not prevent the jury from reaching "just and reasonable estimate[s] of damage based on the relevant evidence." *Lehrman*, 464 F.2d at 44. None of the defendants have argued the formula itself is intrinsically unreliable. The formula incorporates price, demand, and sales variables that are highly relevant to the common question of whether the plaintiffs were overcharged for terazosin hydrochloride. All of the variables in the formula draw upon evidence common to the class, including Abbott's sales volume, pricing, and discount records, the defendants' internal projections concerning the rate of generic substitution, and market data concerning reported price differences between branded and generic terazosin hydrochloride (and, arguably, other drugs) after generic entry. (*See* Pls. Reply at 26–27, Exs. 6–7; Schondelmeyer Decl. ¶ 53–59.) This common proof may conclusively establish the amount of Hytrin sold to each direct purchaser and assist the jury in determining substitution rates and price differences. The fact the jury will also have to consider some individualized evidence in rendering individual damage calculations hardly precludes class certification.[12]

The defendants' assertions concerning the complexity of their pricing practices and other data used in the pharmaceutical industry do not persuade the Court that "individual damage calculations will overwhelm the proceedings." (Defs.' Opp'n at 31; *see id.* at 33–38.) The plaintiffs have demonstrated that damages may be estimated with common proof and a common method. Indeed, the jury may be able to calculate damages on an aggregate, class-wide basis and allocate those funds to individual direct purchasers.[13]

---

**12.** *See, e.g., In re Commercial Tissue Products,* 183 F.R.D. 589, 596 (N.D.Fla.1998) ("individual questions of damages are often encountered in antitrust actions, and they are rarely a barrier to certification"); *In re Catfish Antitrust Litig.,* 826 F.Supp. at 1043 (same); *In re Folding Carton*

*Antitrust Litig.,* 75 F.R.D. 727, 734 (N.D.Ill.1977) (same).

**13.** (*See* Pls.' Reply at 25–27; Schondelmeyer Dep. at 71–76); *see also Allapattah Servs., Inc. v. Exxon Corp.,* 61 F.Supp.2d 1335, 1343 n. 16 (S.D.Fla.1999) ("Once the defendant's total

Complex industries, practices, or data are often examined in the course of class actions.[14] Abbott, Geneva, and Zenith cannot insist on a completely mechanical calculation of damages in this case. Their contracts in restraint of trade effectively precluded such a computation.[15]

Questions concerning the existence of the conspiracy, the impact of the conspiracy, and the formulaic measure of damages will have a substantial impact in each class member's underlying case, and thus predominate over any issues that are not common to the proposed class. The plaintiffs have satisfied the first prong of *Federal Rule* 23(b)(3).

## B. Superior Method

■ Both the proliferation of common issues of law or fact and the plausibility of the plaintiffs' theories concerning impact and damages strongly suggest that the class action mechanism offers a superior method for adjudicating the direct purchasers' claims. *Federal Rule* 23(b)(3) provides that the Court may assess the superiority of the class action mechanism by weighing class members' interest in pursuing separate actions, the extent of any independent litigation already commenced by class members, the desirability of concentrating the litigation in this forum, and the "difficulties likely to be encountered in the management of a class action." FED. R. CIV. P. 23(b)(3). Although several direct purchasers are pursuing independent actions, the class action mechanism offers substantial economies of time, effort, and expense for the litigants as well as the Court. Abbott, Geneva, and Zenith have not suggested a superior alternative. The Joint Panel on Multi–District Litigation has trans-

ferred antitrust claims concerning terazosin hydrochloride to this forum for consolidated pre-trial proceedings, and the difficulties inherent in managing the direct purchasers' proposed class action are not insurmountable. *See In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. at 532–33; *In re Carbon Dioxide Antitrust Litig.*, 149 F.R.D. at 234; *In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. at 625 ("this action is likely to generate difficulties whether it proceeds as a class action or as hundreds of individual trials").

Class action treatment is "superior to other available methods for the fair and efficient adjudication of the controversy," and offers the only realistic alternative for smaller direct purchasers to participate in this litigation. *See Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980). The Court will certify a direct purchaser plaintiff class.

## CONCLUSION

For the reasons expressed in the foregoing opinion, it is hereby

ORDERED that the Plaintiffs' Consolidated Motions for Class Certification [Civ. No. 98–3125 (**D.E. No. 130**), Civ. No. 99–7143 (**D.E. No. 38**)] are GRANTED. This action shall be maintained by class representatives Louisiana Wholesale Drug Co. and Valley Drug Co., through their counsel, as a class action on behalf of the direct plaintiff purchaser class, defined as "all purchasers of both brand name and generic drugs who also purchased terazosin hydrochloride directly from Abbott at any time during the period

---

damages liability has been determined, then the allocation of that aggregate sum among class members is an internal class action accounting question that does not directly concern the defendant.").

**14.** *See In re Brand Name Prescription Drugs Antitrust Litig.*, MDL No. 997, 1994 WL 663590, at *7 (N.D.Ill.1994) (certifying class of independent pharmacists pursuing antitrust claims against drug manufacturers); *In re Commercial Tissue Products*, 183 F.R.D. at 594 ("an industry cannot escape class action liability merely by creating an inscrutably complex pricing regime"); *In re Folding Carton Antitrust Litig.*, 75 F.R.D. at 734 ("contentions of infinite diversity of product,

marketing practices, and pricing have been made in numerous cases and rejected").

**15.** *See Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684 (1927) ("[A] defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff[ ] is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible."); *Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1565 (11th Cir.1986) (citing *Eastman Kodak Co.* decision for same proposition).

commencing March 31, 1998, through the time when the illegal agreements terminated." This determination is conditional and may be modified prior to the decision on the merits in light of any changes in the circumstances that make such modification advisable. *See* FED. R. CIV. P. 23(c)(1).

## ORDER AMENDING SEPTEMBER 20, 2001, CLASS CERTIFICATION ORDER

THIS MATTER is before the Court *sua sponte.* After further consideration, the Court has determined that it is necessary to clarify and abbreviate the current definition of the Sherman Act Class in order to ensure the clearest possible notice and avoid any misunderstanding with respect to the scope of the class. It is therefore

ORDERED the Court's September 20, 2001, Order Granting Plaintiffs' Consolidated Motion for Class Certification, specifically pages sixteen and seventeen thereof, is hereby AMENDED and REVISED to reflect that the *"direct purchaser plaintiff class"* shall be generally defined as *"all entities who purchased Hytrin, also known by the chemical name terazosin hydrochloride, directly from Abbott at any time during the period commencing March 31, 1998, through August 13, 1999."* Excluded from the class are defendants Abbott Laboratories, Inc., Geneva Pharmaceuticals, Inc., Zenith Goldline Pharmaceuticals, Inc., their officers, directors, management, employees, subsidiaries, and affiliates. Specialty distributors or repackagers that neither purchased generic drugs nor obtained increased discounts on Hytrin after the introduction of generic terazosin hydrochloride are also excluded from the class.