**In re TERAZOSIN HYDROCHLORIDE ANTITRUST LITIGATION.**

**No. 99–MDL–1317.**

United States District Court, S.D. Florida.

June 23, 2004.

---

Mitchell Wayne Berger, Berger Singerman, Fort Lauderdale, FL, Daniel Berger, David Sorensen, Berger & Montague, P.C., Joseph C. Kohn, Kohn, Swift & Graf, Philadelphia, PA, Jack Staph, Jack Staph & Associates, Pepper Pike, OH, Richard Drubel, Boies, Schiller & Flexner, Hanover, NH, Richard Alan Arnold, Kenny, Nachwalter, Seymour, Arnold, Critchlow & Spector, Miami, FL, Robert Scott Palmer, C. Oliver Burt, III, Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, West Palm Beach, FL, Aubrey B. Calvin, Mark S. Armstrong, The Calvin Law Firm, Houston, TX, David P. Smith, Percy, Smith, Foote & Gadel, Alexandria, LA, John Gregory Odom, Stuart E. Des Roches, Odom & Des Roches, New Orleans, LA, for Plaintiffs.

Jon W. Zeder, Wesley Robert Parsons, Adorno & Yoss, Jay Brian Shapiro, Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, Paul Alan Shelowitz, Akerman, Senterfitt & Eidson, Benjamine Reid, Maria Charles McGuinness, Carlton Fields, Miami, FL, Stephen E. Morrissey, Jeffrey I. Weinberger, Stuart N. Senator, Munger, Tolles & Olson, Los Angeles, CA, Gerson A. Zweifach, Steven R. Kuney, Kevin M. Downey, Kirsten M. Schmipff, Williams & Connolly, Washington, DC, Robert Alexander Milne, Wayne A. Cross, Eamon O'Kelly, Dewey Ballantine, New York, NY, for Defendants.

### ORDER DENYING SHERMAN ACT CLASS PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION

SEITZ, District Judge.

THIS CAUSE is before the Court on the Sherman Act Class Plaintiffs' Renewed Motion for Class Certification. **[D.E. 1113]**. The United States Court of Appeals for the Eleventh Circuit ("Eleventh Circuit") vacated this Court's September 20, 2001 order certifying a class of direct drug purchasers in this antitrust case and remanded for further proceedings including conducting "downstream discovery." *See Valley Drug Co., et al., v. Geneva Pharm., et al.,* 350 F.3d 1181 (11th Cir.2003).[1] Upon review of the Motion, Response, Reply, supporting reports and exhibits, and after holding an extensive oral argument, the Sherman Act Class Plaintiffs have failed to meet their burden to show that class certification is appropriate. Specifically, in light of the Eleventh Circuit opinion,

---

1. The Court will refer to this decision as the "Eleventh Circuit opinion" throughout the remainder of this Order.

and after permitting Defendants to conduct downstream discovery, the Sherman Act Class Plaintiffs have failed to demonstrate—through empirical evidence, data, and an identifiable formula—the absence from the proposed class of any class members who benefitted from the alleged anti-competitive agreements at issue. The Eleventh Circuit opinion remanded this case to enable Plaintiffs to address this specific issue, and presented the Plaintiffs with an opportunity to show that no fundamental conflict exists to prevent the defined class from satisfying the adequacy of representation prong of Federal Rule of Civil Procedure 23(a)(4). Plaintiffs have failed to meet their burden. Consequently, the Motion is denied.

### Factual and Procedural Background

#### I. Factual Background[2]

Named class representatives Louisiana Wholesale Drug ("Louisiana Wholesale") and Valley Drug Company ("Valley Drug") sued Defendants Abbott Laboratories ("Abbott"), Geneva Pharmaceuticals, Inc. ("Geneva"), and Zenith Goldline Pharmaceuticals, Inc. ("Zenith"),[3] under Section Four of the Clayton Act[4] and Section One of the Sherman Act,[5] alleging that Defendants entered into anti-competitive settlement agreements. The Defendants entered into two agreements in 1998, one between Abbott and Geneva and another between Abbott and Zenith. These settlement agreements allegedly illegally extended Abbott's monopoly for Hytrin, the brand-name terazosin hydrochloride drug prescribed for the treatment of hypertension or enlarged prostrate, by delaying the entry into the market of Geneva and Zenith's competing generic forms of terazosin hydrochloride and forestalling the entry of other generic competition.

Pursuant to several patents, Abbott exclusively manufactured and marketed the chemical compound terazosin hydrochloride under the brand name "Hytrin." Hytrin proved to be a lucrative drug for Abbot; in 1998, Hytrin generated $540 million in sales which accounted for more than twenty percent of Abbott's sales of pharmaceutical products in the United States that year. Geneva and Zenith are generic drug manufacturers that developed generic versions of Hytrin for sale in the United States and sought to obtain a share of the Hytrin market.

#### A. The Regulatory Framework and Abbott's Patent Litigation

A drug patent gives its owner the right to exclude others from making, using, or selling the drug in the United States for the duration of the patent. However, before a patent holder may begin selling a new drug, it must obtain the Food and Drug Administration's ("FDA") approval.[6] Applications for FDA approval can be filed as either new drug applications ("NDA") or abbreviated new drug applications ("ANDA"). Upon FDA approval, information regarding any claimed patents is listed in a publication known as the Orange Book.

---

2. The facts of this case have been discussed extensively by the Eleventh Circuit in *Valley Drug Co.*, 350 F.3d at 1183–87 (vacating the certification of a direct purchaser class) and *Valley Drug Co. v. Geneva Pharmaceuticals, Inc., et al.*, 344 F.3d 1294 (11th Cir.2003) (reversing this Court's holding that the alleged anti-competitive agreements were *per se* violations of Section One of the Sherman Act).

3. Zenith, now known as Ivax Pharmaceuticals, Inc., settled this action and is no longer a party in this case.

4. Section Four of the Clayton Act states in relevant part:

   [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. 15 U.S.C. § 15(a).

5. Section One of the Sherman Act states in relevant part:

   Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared illegal. 15 U.S.C. § 1.

6. The regulatory framework governing FDA approval for drugs, and the significance of the patent system, is explained more thoroughly in the Eleventh Circuit Court of Appeals' decision in *Valley Drug Co.*, 344 F.3d at 1296–1300.

As a patent nears expiration, generic manufacturers often seek to market the generic version of brand name drugs that the FDA previously approved as an NDA. In such a case, the Drug Price Competition and Patent Term Restoration Act of 1984, 21 U.S.C. § 355 ("the Hatch–Waxman Act") permits the generic drug manufacturers to seek expedited FDA approval by filing an ANDA pursuant to 21 U.S.C. § 355(j). While the NDA applicant must submit safety and efficacy studies for every proposed new drug, ANDA applicants may piggyback on the safety and efficacy data the manufacturer of the brand name equivalent drug has already filed with the FDA.

After a generic applicant has submitted its ANDA to the FDA, it must file a patent certification with respect to each patent claiming the listed drug (or a method of using the listed drug) of which the applicant is aware. In so doing, the applicant must certify that: (1) the patent information has not been filed with the FDA; (2) the underlying patent is expired; (3) the patent will expire, identifying the expiration date; or (4) the patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug. If the applicant certifies either that the patent information has not been filed or that the patent is expired, FDA approval of the ANDA can proceed immediately. If the patent has not yet expired, the ANDA will not be approved until after the expiration date of the relevant patent. However, if the certification falls into the fourth category (known as a "paragraph IV certification"), the applicant must notify the patent holder, who then has the statutory right to bring suit for patent infringement within forty-five days, which will automatically delay approval of the ANDA for a period of thirty months.

Abbott holds a number of patents permitting it to manufacture and market drugs containing the chemical compound terazosin hydrochloride. Specifically, between 1977 and 1996, the United States Patent and Trademark Office issued Abbott seven different patents covering various terazosin formu-

lations. Because of Hytrin's success in the pharmaceutical market, in the early 1990s, several generic drug makers including Geneva and Zenith began taking steps to develop generic versions of Hytrin that contained the same active chemical components but different inactive ingredients. For instance, between 1993 and 1996, Geneva filed four ANDAs based on Abbott's NDA for Hytrin, each time making paragraph IV certifications. In September 1994, Abbott exercised its statutory right to sue Geneva for patent infringement and initiated several actions against Geneva in the United States District Court for the Northern District of Illinois. The ensuing litigation allegedly delayed Geneva's efforts to market its own generic drug for an indefinite period of time pending resolution of the parties' ongoing patent disputes. Abbott also instituted legal actions against Zenith in 1994 and 1995, after it learned that Zenith had filed an ANDA for a terazosin hydrochloride drug. Therefore, from 1994 onwards, Abbott found itself involved in concurrent disputes with both Geneva and Zenith, as well as other generic manufacturers, over the validity of its Hytrin patents while Geneva and Zenith competed with each other to bring the first generic terazosin hydrochloride drug to market.[7]

## B. The Abbott–Zenith and Abbott–Geneva Agreements

In late March and early April 1998, Abbott entered into separate confidential settlement agreements with Zenith and Geneva, its two potential competitors, to allegedly resolve the ongoing patent litigation. Under the Abbott–Zenith agreement, entered into on March 31, 1998, Zenith agreed to accept $3 million to join Abbott in dismissing the pending actions between the two parties, as well as an additional $6 million per quarter to "not sell, offer for sale, donate, or otherwise commercially distribute in the United States any Terazosin Hydrochloride Product." Zenith also agreed not to aid or assist anyone else to obtain FDA approval to market a

---

7. The Hatch–Waxman Act gives a generic drug manufacturer a strong incentive to file an ANDA application and receive first FDA approval because the first successful ANDA applicant re-

ceives a 180–day period of marketing exclusivity as against other generic makers for that drug compound. *See* 21 U.S.C. § 355(j)(5)(B)(iv).

similar product and obtained Abbott's permission to market its product once generic competition began.

Similarly, pursuant to the April 1, 1998 Abbott–Geneva agreement, Geneva agreed to accept Abbott's payment of $4.5 million per month to refrain from selling any generic terazosin hydrochloride drug, including a terazosin capsule for which Geneva had obtained FDA approval in March 1998, until the earlier of: (1) the date on which another drug maker sold a generic version of Hytrin in the United States; or (2) the date on which Geneva received a final, unappealable judgment that its proposed generic tablet did not infringe Abbott's patents. The Agreements also called for Geneva's assistance in opposing any subsequent ANDA applicant's attempt to seek approval of its application based on Geneva's failure to satisfy the then-existing successful defense requirement and for Geneva to join and support any attempt by Abbott to seek an extension of the 30-month stay of FDA approval on Geneva's tablet ANDA.

Thus, until August 1999, Abbott exclusively sold the only terazosin hydrochloride drug available in the United States. The Abbott–Zenith and Abbott–Geneva agreements terminated on August 13, 1999, following a Federal Trade Commission investigation of the agreements which resulted in a consent settlement. On August 13, 1999, Geneva began to market its terazosin capsules, the first generic terazosin hydrochloride drug in the United States. Other generics followed such as Mylan's terazosin capsule introduced in February 2000. While Abbott raised its average wholesale price for Hytrin capsules by 11.8% in the nine months following Geneva's entry into the market, Geneva's capsules were sold at a price approximately 46% lower than Hytrin. Following additional generic penetration into the market, the generic average wholesale price dropped even further so that by April 2000, it was less than 16% of Abbott's Hytrin price.

## II. *Procedural Background*

Plaintiffs, regional wholesalers Valley Drug and Louisiana Wholesale, purchased Hytrin directly from Abbott during the period of time the agreements were in effect. The Class Plaintiffs characterize the Defendants' agreements as an illegal "market-allocation" which caused class members to be overcharged by: "(1) keeping interchangeable, but less expensive, generic versions of Hytrin off the market; and (2) causing direct purchasers to lose discounts on Hytrin that they might have received if the settlement agreements had not shielded Abbott from generic competition." *Valley Drug,* 350 F.3d at 1186.

### A. *September 20, 2001 Order Certifying Sherman Act Class*

On November 30, 1999, Valley Drug and Louisiana Wholesale moved to certify a class of purchasers who directly purchased terazosin hydrochloride from Abbott during the period of March 31, 1998, through the time the settlement agreements terminated. On September 20, 2001, this Court granted the motion and certified a class defined in relevant part as: "all purchasers of both brand name and generic drugs who also purchased terazosin hydrochloride directly from Abbott at any time during the period commencing March 31, 1998, through the time when the illegal agreements terminated." *In re Terazosin Hydrochloride Antitrust Litig.,* 203 F.R.D. 551, 560–61 (S.D.Fla.2001). The Court subsequently amended the definition of the direct purchaser class as, in relevant part: "all entities who purchased Hytrin, also known by the chemical name terazosin hydrochloride, directly from Abbott at any time during the period commencing March 31, 1998 through August 13, 1999." *Id.* at 561. On January 10, 2002, the Eleventh Circuit granted an interlocutory appeal of the certification decision under Federal Rule of Civil Procedure 23(f). [D.E. 619].

### B. *Order of Remand*

On November 14, 2003, the Eleventh Circuit vacated this Court's order granting class certification and remanded the case "to permit the parties to conduct further discovery on the important issue of whether some class members have separate, antagonistic interests from the named representatives." *Valley Drug Co.,* 350 F.3d at 1187. The Elev-

enth Circuit noted further that, "the district court was required to evaluate whether the 'adequacy of representation' requirement could be satisfied by the named representatives despite the fact that the most significant members of the certified class arguably experienced a net gain from the conduct alleged to be illegal by the named representatives." *Id.* at 1188. The Eleventh Circuit instructed this Court to permit "downstream discovery" to determine if a fundamental conflict exists between the named class representatives and other members of the class. "Fundamental conflict [would exist] where some party members claim to have been harmed by the same conduct that benefitted other members of the class." *Id.* at 1189. "In such a situation the named representatives cannot 'vigorously prosecute the interests of the class through qualified counsel' because their interests are actually or potentially antagonistic to, or in conflict with, the interests and objectives of other class members." *Id.* (citations omitted).

The Eleventh Circuit focused on the alleged net economic benefit to the three current national wholesalers-McKesson, Cardinal, and Amerisource Bergen-and stated: "[i]t may turn out that the national wholesalers presently encompassed by the class do not experience a net benefit from the ab-

sence of generic competition because of factors not disclosed in the record before us thus far or because, after a careful assessment of the facts, the evidence provided by the defendants is deemed to be inaccurate or unreliable." *Id.* at 1191–92. Finally, the Eleventh Circuit concluded its opinion with instructions regarding the direct purchasers' production of sales, volume, and discount records.[8]

At the initial status conference following the Eleventh Circuit decision, held on November 24, 2003, the Court and counsel discussed how to conduct the downstream discovery in the most expeditious and cost efficient manner. Counsel represented to the Court that because they knew the general counsel for the wholesalers and the Plaintiffs desired an early trial date, they believed discovery could be completed in a few months. The Court instructed the parties to develop a discovery tool to obtain the necessary documents to satisfy the Eleventh Circuit mandate.

On December 19, 2003, this Court approved the Defendants' form of subpoena, with modifications, to twenty-three representative direct purchasers and the two named class representatives.[9] The subpoenas re-

---

**8.** The Eleventh Circuit noted:

Many of the factors taken into account by plaintiffs' experts in deriving their formula, e.g., "the amount of Hytrin purchased from Abbott by a class member," "the expected price difference between Hytrin and the generic [substitute]," and "the expected substitution rate of generic terazosin [hydrochloride]" can be just as easily used in creating a formula to determine whether certain class members experienced a net gain in the absence of generic competition. *In re Terazosin Hydrochloride II,* 203 F.R.D. at 559 (alterations in original). Along these lines, the district court noted that the plaintiffs had access to Abbott's "sales, volume, pricing, and discount records," which would enable plaintiffs to establish class-wide impact and damages for purposes of satisfying the "predominance" requirement of Rule 23(b)(3). *Id.* While we do not reach an opinion on that particular holding of the district court, we have no reason to believe that it would be inherently more difficult to ascertain similar evidence with respect to the three national wholesalers and other Hytrin purchasers to determine whether these class members experienced a net benefit from the effects of defendants' conduct. Accordingly, we do not

believe that it is unduly burdensome to require the named representatives to bring forth evidence to the court that no fundamental conflict exists among the class members, especially in view of Rule 23 ... *Id.* at 1195–96.

**9.** While the potential class members as previously defined numbered over 1900 members, the parties agreed to target twenty-three representative direct purchaser potential class members—consisting of the national wholesalers, regional wholesalers, pharmaceutical benefits managers, and retailers—and the two named class representatives Valley Drug and Louisiana Wholesale. These entities were: (1) Amerisource Bergen Corp.; (2) McKesson Corp.; (3) Cardinal Health, Inc.; (4) Medco Health Solutions, Inc.; (5) Wal-mart Stores, Inc.; (6) Express Scripts; (7) Caremark; (8) Kinray; (9) Walsh Distribution; (10) PacifiCare Health Systems; (11) Advance PCS, Inc.; (12) D & K Healthcare Resources, Inc.; (13) Ahold USA, Inc.; (14) Morris & Dickson; (15) Frank W. Kerr Company; (16) Omnicare, Inc.; (17) F. Dohmen Company; (18) Value Drug; (19) Longs Drug Stores Corp.; (20) H.D. Smith; (21) J.M. Smith; (22) Mutual Drug; and (23) McQueary. *See Not. of Joint Submission of*

quested information about brand-name Hytrin sales and purchases from the period starting on January 1, 1998 and ending on December 31, 2000, and information about sales and purchases of generic terazosin hydrochloride starting from July 1, 1999 through December 31, 2000. [**D.E. 1035**]. From December 2003 until April 2004, the parties engaged in discovery of this information [10] to prepare for the Sherman Act Class Plaintiffs' Renewed Motion for Class Certification.

## C. Renewed Motion for Class Certification

On March 19, 2004, the Sherman Act Class Plaintiffs filed their renewed motion for class certification. In their Motion, Plaintiffs argue that: (1) the national wholesalers and other putative class members all significantly benefit when any generic equivalent drug enters the marketplace; (2) some of the putative class members affirmatively state through affidavits that they have no actual or potential conflict with the named class representatives, and to the extent there is a conflict, they waive the conflict; and (3) even assuming that some class members did benefit from delayed entry, the Eleventh Circuit instructed this Court to weigh any alleged net benefit from delayed entry against the potential recovery for overcharge damages for the class members. In short, Plaintiffs argue that the potential antitrust recovery eclipses any net benefit from delayed entry.

In response, Defendants assert that class certification is inappropriate because: (1) Plaintiffs failed to ensure compliance with the downstream discovery subpoenas to determine if any putative class members benefitted from delayed entry of generic tera-

zosin; (2) assuming that there had been compliance with the subpoenas and the necessary data had been gathered, the Plaintiffs have come forward with no formula or analysis to determine which entities may have benefitted from delayed entry; (3) with the limited data the subpoena targets did produce, Defendants show that at least one of the major national wholesalers did receive a net benefit from delayed entry; and (4) the Plaintiffs cannot waive potential or actual conflicts through affidavits because the Court must conduct its own independent inquiry. Thus, Defendants argue, Plaintiffs have failed to meet the explicit test the Eleventh Circuit established regarding the adequacy of the class representatives' representation of the absent class members' interests and, therefore, class certification must be denied. The Court now turns to these arguments.

## Discussion

### I. Federal Rule of Civil Procedure 23

■ The burden of proof to establish the propriety of class certification rests with the advocate of the class—here, the Sherman Act Class Plaintiffs. *See Gilchrist v. Bolger,* 733 F.2d 1551, 1556 (11th Cir.1984). "Class actions are not an automatic entitlement under [the] federal rules of civil procedure." *Valley Drug,* 350 F.3d at 1196 (citation omitted). "A class action may be maintained only when it satisfies all of the requirements of Fed. R.Civ.P. 23(a) and at least one of the alternative requirements of Rule 23(b)." *Rutstein v. Avis Rent–A–Car Sys., Inc.,* 211 F.3d 1228, 1233 (11th Cir.2000) (citation omitted). In addition to the other prerequisites of Rule

*Agreed Representative Sample for Purposes of Conducting Downstream Discovery,* 99–MDL–1317 (filed December 12, 2003) at Ex. A [**D.E. 1025**].

10. The question of compliance with the Court-ordered downstream discovery subpoenas became the subject of an unsolicited volley of Defendants' reports and Plaintiffs' responses. The Defendants filed their preliminary, second, and third reports on April 1, 2004, April 30, 2004, and May 20, 2004, respectively. On April 19, 2004 and May 19, 2004, the Sherman Act Plaintiffs replied to the Defendants' preliminary report and second Report, respectively.

In short, Defendants argued that the subpoena targets did not cooperate with the subpoena requests, produced unusable data, produced data in a burdensome format, such as in hard copy rather than electronic format, or "dumped" documents at the last moment. Plaintiffs responded that they had complied with the subpoenas, that any failure to produce documents or data was the result of logistical and mechanical problems or good-faith mistakes, or the data had not been retained. Additionally, Plaintiffs maintained that Defendants were engaging in gamesmanship.

23(a),[11] the plaintiff must meet the requirements of Rule 23(a)(4).

## II. Rule 23(a)(4): Adequacy of Representation [12]

■■■ Rule 23(a)(4) requires that the representative party in a class action "must adequately protect the interests of those he purports to represent." *Valley Drug,* 350 F.3d at 1189 (citing *Phillips v. Klassen,* 502 F.2d 362, 365 (D.C.Cir.1974)). This requirement applies to both the named plaintiffs and to the class counsel. *See London v. Wal–Mart Stores, Inc.,* 340 F.3d 1246, 1253 (11th Cir.2003) (citing *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 626 n. 20, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). "Because all members of the class are bound by the res judicata effect of the judgment, a principal factor in determining the appropriateness of class certification is the forthrightness and vigor with which the representative party can be expected to assert and defend the interests of the members of the class." *Lyons v. Georgia–Pacific Corp. Salaried Employees Ret. Plan,* 221 F.3d 1235, 1253 (11th Cir. 2000) (internal citations omitted). This analysis "encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Valley Drug Co.,* 350 F.3d at 1189 (citing *In re HealthSouth Corp. Sec. Litig.,* 213 F.R.D. 447, 460–61 (N.D.Ala.2003)). "[I]f substantial conflicts of interest are determined to exist among a class, class certification is inappropriate." *Id.*

As the Eleventh Circuit noted in its remand decision, "the existence of minor conflicts alone will not defeat a party's claim to class certification; the conflict must be a 'fundamental' one going to the specific issues in controversy." The Eleventh Circuit noted further that a fundamental conflict exists "where some party members claim to have been harmed by the same conduct that benefitted other members of the class." "In such a situation, the named representatives cannot 'vigorously prosecute the interests of the class through qualified counsel' because their interests are actually or potentially antagonistic to, or in conflict with, the interests and objectives of other class members." *Id.* (citing *In re HealthSouth,* 213 F.R.D. at 461–63); *see also Pickett v. Iowa Beef Processors,* 209 F.3d 1276, 1280 (11th Cir.2000) (holding that "a class action cannot be certified when its members have opposing interests or when it consists of members who benefit from the same acts alleged to be harmful to other members of the class."). Because the Eleventh Circuit concluded, based on the record before it, that it appeared the proposed class consisted of net "winners" and "losers," it remanded the case to resolve this potential fundamental conflict.

### A. Plaintiffs' Failure to Carry Burden

■ The Eleventh Circuit's opinion raises two concerns, namely whether the national wholesalers: (1) made the same margin on the generic and the higher-priced brand-name terazosin hydrochloride drug, and thus made more money reselling the higher priced brand-name drug; and (2) lost sales volume on terazosin when a generic entered the marketplace (through "generic bypass" [13]). *Val-*

11. The Eleventh Circuit stated that "the case must be remanded to permit the parties to conduct further discovery on the important issue of whether some class members have separate, antagonistic interests from the named representatives. As this issue decides the case, we do not need to reach the other arguments presented to this court by the defendants." *Id.* at 1187. The Eleventh Circuit's opinion and the parties' briefs on remand focus exclusively on the adequacy of representation requirement of Rule 23(a)(4). Therefore, the Court's ruling addresses solely this prong of Rule 23, and its conclusions on the remaining Rule 23 elements set forth in *In re Terazosin Hydrochloride Antitrust Litigation,* 203 F.R.D. 551 (S.D.Fla.2001) remain standing.

12. Examination of the adequacy of representation prong is not a standing analysis. The Eleventh Circuit clearly stated that those direct purchasers, even those who experienced a net benefit from the alleged illegal conduct, could still pursue claims for overcharge damages if the cost-plus exception does not apply to them. *Valley Drug,* 350 F.3d at 1193.

13. "Generic bypass" occurs when, after a generic is introduced, the wholesaler is bypassed completely and the generic manufacturer sells directly to the customer. Thus, the wholesaler suffers a loss of sales to its prior customers.

*ley Drug,* 350 F.3d at 1191. In fulfilling the Eleventh Circuit's instructions, the parties agreed that a representative sample of twenty-three discovery targets would produce relevant sales, pricing, volume, and discount records. The plan was that after the subpoena targets produced that data, the parties would analyze it and make an empirical showing of whether: (1) none of the representative sample targets gained a net benefit from delayed generic terazosin hydrochloride competition; (2) all of the representative sample targets gained a net benefit; or (3) a mixture of representative sample targets gained a net economic benefit while others did not.

The Court expected that after downstream discovery had concluded, the Defendants, through expert economic analysis, would attempt to show a collection of net "winners" and "losers" that would defeat class certification. Conversely, the Plaintiffs, through their expert analysis, would create a formula to demonstrate that none of the twenty-three representative subpoena targets gained a net-economic benefit or Plaintiffs would otherwise propose a new class definition. Thus, the parties would have established a preliminary "battle of the experts" regarding the two "net-benefit" formulas and sets of conclusions. However, this expert battle never developed.

Instead, the Sherman Act Class Plaintiffs did not produce sufficient data either due to an inability to comply with the subpoenas or a refusal to cooperate. The parties agree that subpoena targets ExpressScripts, Omnicare, and Morris & Dickson did not comply with the subpoena at all. Defs.

Resp. at 5. As to the remaining targets, due to mergers and consolidations in the industry,[14] the sheer volume of data, the need to create new data compilation programs,[15] the large number of subpoenas outstanding from other litigation matters,[16] and honest mistakes,[17] production of the requested information was difficult. The Court and the Defendants do not dispute the good-faith and diligent efforts made to compile this data, but the bottom line is that all of the expected data was not produced. Moreover, at no point, after the subpoenas issued and before the renewed class certification was filed, did Plaintiffs advise the Court that the agreed downstream discovery would be logistically impossible because the sales, volume, and purchase data had not been retained or because of insuperable technological problems. Also, Plaintiffs did not request more time to produce this data or to file the renewed motion for class certification.

Thus, the Sherman Act Class Plaintiffs failed to meet their burden in two ways. First, as the parties bearing the evidentiary burden on this issue, they produced inadequate relevant empirical data to analyze the economic position of each of the twenty-three absent putative class members to demonstrate whether each was a net "winner" or "loser." Second, even if such data had been produced, the representative Class Plaintiffs never devised a method or formula to analyze that data. This Court reads the Eleventh Circuit opinion to require such production and analysis to satisfy the adequacy scrutiny under Rule 23(a)(4). For whatever reason, Plaintiffs have run away from this issue.[18]

---

**14.** *See* Or. Arg. [84:21–85:13].

**15.** *Id.*

**16.** *Id.* at [84: 8:20].

**17.** *Id.* at [99:6–102:1]

**18.** Defendants assert they received usable data to determine a net benefit for only two subpoena targets which their expert reviewed. Dr. Rubinfeld's analysis for then national wholesalers Amerisource and Bergen shows that they experienced a slightly higher net margin on Hytrin before generic drug entry. *See Rubinfeld Report* at Tab 4, Ex. 1–3 (filed April 21, 2004).

|  | Pre–Entry Margins on Hytrin | Post–Entry Combined Margins | Post–Entry Hytrin Margins | Terazosin Margins |
|---|---|---|---|---|
| Amerisource | 6.4 cents | 5.6 cents | 6.2 cents | 3.9 cents |
| Bergen Brunswick | 7.5 cents | 7.0 cents | 6.0 cents | 6.3 cents |

Unfortunately, this choice leaves the Court with no alternative but to deny this motion on this ground.

## B. Plaintiffs' Alternative Approaches Do Not Satisfy Eleventh Circuit Requirement

In what appears to be a tacit concession that they have failed to address the Eleventh Circuit's issues, the Sherman Act Class Plaintiffs offer three approaches to satisfy their burden. First, Plaintiffs produce the Report of H. Edward Heckman, Ph.D., plus newspaper articles, SEC filings, and financial reports to show that generic entry of a brand-name drug benefits all direct purchasers because of lower costs and higher profit margins for such drugs. Second, the Plaintiffs submit the affidavits from the larger national wholesalers and other putative class members that state they do not see a conflict in being represented by the named class representatives, but if there is such a conflict, they waive it. Third, Plaintiffs argue that the net margin benefit analysis must be examined in light of the relative cognizable overcharge antitrust injury the Plaintiffs suffered. Even assuming a ten (10) cent per pill margin benefit from delayed generic terazosin entry—an unrealistic margin used for illustrative purposes-the antitrust overcharge injury overwhelms any net margin benefit. The Court turns to these three arguments.

### 1. Heckman Report and Other Exhibits

To support its first argument, the Plaintiffs submit the report of Dr. H. Edward Heckman. *See* Pls.' Ex. D. Dr. Heckman summarizes the benefits to the direct purchasers from generic entry as: (1) higher margin profit on generics as compared to brand-name drugs; and (2) the total expansion of sales based on the pioneer drug maker's need to focus on a newer version of the drug, a theory which he labels the "brand to generic short-circuit theory."

As to his first point, Dr. Heckman reports that class members prefer the entry of generic drugs because their margins, liquidity and return on investment are significantly higher, and their costs are significantly lower, with generic drugs than brand name drugs. *See* Ex. D, Heckman Report at 9–11, 14. However, Dr. Heckman's opinions speak of the class members *generally* and fail to address the issues relevant to *this case,* namely any prices, margins, profits, or any other indicia of economic benefit from the entry of the *specific* generic terazosin hydrochloride drug during the relevant time period (namely, 1998–2000). In fact, as Dr. Heckman admitted, he did not try to determine the actual effect that the entry of generic terazosin had on the business of any putative class member. *See* Heckman Dep. at 109 ("[M]y assignment was to look, in general, at the net economic effects as it pertains to generics entering the marketplace.").

As to his second point, Dr. Heckman posits the "brand to generic short-circuit" theory, whereby the introduction of a generic will prompt the maker of the brand-name drug to shift its focus on advertisement and promotion from the original pioneer drug to a newer drug: in Abbott's case, from Hytrin to Flomax. *Id.* at 21–22. As a result of the entry of generic terazosin hydrochloride, Dr. Heckman maintains, Abbott increased promotion for Flomax, and, thus, total prescriptions of terazosin (brand and generic) and Flomax increased 27% spurring an expansion of sales benefitting the direct purchasers. *Id.* at 23.

Unfortunately, this theory does not support the proposition that the putative class members benefitted from the entry of gener-

---

This analysis does not include a potential pass-on of manufacturer's rebates, the possible phenomenon of "generic bypass," or generic price lags (i.e., when the wholesale acquisition price of generic terazosin fell, the wholesalers lost money on their existing inventory of generic terazosin). *Id.* at ¶¶ 76, 89, 93–94.

Although the Court does not endorse Dr. Rubinfeld's methodology or formula, Plaintiffs have neither rebutted this conclusion with their own empirical formula nor shown that this calculation is unreliable. *Valley Drug,* 350 F.3d at 1191–2 (stating that plaintiffs could show that "evidence provided by defendants is deemed to be inaccurate or unreliable").

ic terazosin hydrochloride. First, the manufacturer of Flomax, Boehringer–Ingellheim, was promoting Flomax before it entered a co-promotion agreement with Abbott, and Flomax existed on the market before the entry of the generic. Heckman Dep. 64–65 at Ex. 13. Second, Dr. Heckman provides no empirical evidence to show the causal connection between the entry of the generic and the "expansion" of the total market for Flomax, Hytrin, and generic terazosin hydrochloride. Instead, the data show that Flomax sales were increasing *before* the entry of the generic drug and that rate of growth did not change appreciably after generic entry. Ex. 9 to Heckman Report. Third, Dr. Heckman's report fails to address the impact of increased Flomax sales as to any individual putative class member. Fourth, if Flomax increased its market share of the treatments for this medical condition under Dr. Heckman's theory, then this increase in market share would have come at the expense of other drugs such as Hytrin and generic terazosin which would have caused the exact

opposite result of what Plaintiffs and Dr. Heckman claim the wholesalers desire, namely, an increase in generic drug volume.

Plaintiffs also rely on newspaper articles,[19] SEC filings,[20] and financial reports[21] that state as a general matter, that direct purchasers prefer the entry of generic drugs into the marketplace because their margins on generics are significantly higher than those on brand-name drugs. *See, e.g.*, Pls.' Exs. E and G. However, as with the Heckman Report, none of these exhibits addresses the drug at issue here, namely terazosin hydrochloride or the relevant time period, or presents any empirical data to support these assertions. *See Rubinfeld Report* at 10–12 (filed April 21, 2004). Plaintiffs argue that "Defendants myopically focus solely on the effect of generic terazosin sales alone ..." Pls.' Mot. at 2. But, in fact, it is Plaintiffs who have neglected to focus on sales of Hytrin or generic terazosin—the relevant drug in this case.[22]

19. *See, e.g.*, Pls.' Ex. G (quoting Milt Freudenheim, "As Patents on Popular Drugs End, Cost for Generics Show a Surge," *New York Times*, December 27, 2002 at A1):

R. David Yost, chief executive of Amerisource Bergen, one of the top three wholesalers, told analysts recently that his company was "making more gross profit dollars" from generic drugs than from brand-name drugs. Officials of McKesson and Cardinal Health the other two top wholesalers, have made similar comments.

20. *See, e.g.*, Pls.' Ex. G (quoting Amerisource Bergen 2001 *Annual Report* 4):

A significant number of patents for widely used brand name pharmaceutical products will expire in the next several years. These products are expected to be marketed by generic manufacturers and distributed by us. We consider this a favorable trend because generic products have historically provided a greater gross profit margin opportunity than brand name products.

21. *See, e.g.*, Pls.' Ex. D–Ex. D (quoting Fitch Ratings, *The Generic Equation: The Emergence of Generic Pharmaceuticals and Their Impact on Pharmaceutical Wholesalers*, October 14, 2003 at 1–4):

Distributors' margins are frequently three to five times greater on generics than on brand drugs, and the related profitability gains more than offset reduced revenues associated with lower-priced generics.

22. At the May 21, 2004 oral argument, representatives of two of the National Wholesalers discussed, in general terms, other benefits of generic entry to the national wholesalers. For example, Howard Scher, who represents Amerisource Bergen, stated that when generics enter the marketplace, a generic drug manufacturer will pay a "service fee" to the wholesaler to be on the wholesaler's "formulary," i.e., a list of preferred generic manufactured drugs recommended to drug retailers. Or. Arg. Trans. [87:18–88:24]. Mr. Scher also discussed the lower borrowing costs associated with less expensive generic drugs and the "float" advantage of generic drugs. *Id.* at [90:17–91:19]. "Float" refers to the fact that wholesalers can make money by being paid by the customer before they have to pay the manufacturer of the drug; they earn interest on the money during this time interval. *Id.* [91:6–19].

Tom Long, counsel representing Cardinal Health, indicated that the ROCC, or Return on Capital Committed, was favorable for less-expensive generics as compared to brand-name drugs because less of the company's capital would be tied up with generic drugs. *Id.* at [104:5–10]. Although Amerisource Bergen and Cardinal make valid points, these facts still do not address the specific drugs of Hytrin or generic terazosin hydrochloride, show no empirical evidence of higher or lower margins on that specific drug, or address the relevant time periods.

## 2. Affidavits/Waiver Issue

Next, the Plaintiffs rely on twenty-three affidavits[23] that, to varying degrees, state that generic competition benefits that direct purchaser and, again to varying degrees, waive any potential conflict.[24] See Pls.' Exs. A–C. The conclusionary statements in the affidavits that those direct purchasers "benefitted from delayed entry," without supporting facts, are inadequate. The Court needs a factual record which can be challenged to test this conclusion. As to the waiver argument, none of the parties have cited to any case law holding that some putative class members can waive actual or potential Rule 23(a)(4) conflicts. The reason for this may be that the Plaintiffs are creating novel solutions to address the issues this new legal territory presents. However, even assuming these sophisticated putative class members can waive any potential conflicts, it is doubtful that these representative members can waive any actual or potential conflicts for the remaining approximately 1,947 members of the defined proposed class. Given the Eleventh Circuit opinion which established the need for a formulaic examination of empirical data, these conclusionary affidavits are insufficient. See Jones v. Firestone Tire and Rubber Co., Inc., 977 F.2d 527, 534 (11th Cir.1992) (noting that Court must conduct its own "rigorous analysis" of each element of Rule 23).

## 3. Proposed Antitrust Injury v. Net Benefit Analysis

Plaintiffs raised for the first time in their Reply Brief the argument that the true formulaic analysis to be used is whether the potential recovery in trebled overcharge damages substantially outweighs any net benefit any putative class member gained. Pls.' Reply at 3; Or. Arg. Tran. [36:7–10] (Mr. Gerstein: "specifically, it shows that what [the Eleventh Circuit] is talking about under the circumstance. It is this weighing between any potential gain versus recovering your antitrust injury."). Plaintiffs argue that any net margin benefit that any direct purchaser class member received would be substantially outweighed by the overcharge damages they now seek to recover. Thus, this reality, according to Plaintiffs, establishes that there can be no Rule 23(a)(4) conflict or antagonism. See Pls.' Reply at Ex. C (chart showing that overcharge recovery far exceeds any "benefit" from delayed entry).

While a logical argument, this analysis misses the Eleventh Circuit's point. See Valley Drug, 350 F.3d at 1193. Specifically, the fact that all direct purchasers can potentially recover a substantial trebled overcharge that overwhelms any net benefit does not address whether some class members benefitted and others did not for purposes of the Eleventh Circuit's Rule 23(a)(4) analysis. Id. at 1195, n. 22 (noting that a common interest in vindicating nation's antitrust laws alone would not

---

**23.** The Court notes that only ten of the original twenty-three subpoena targets submitted affidavits stating that they either: (1) were benefitted by generic entry and/or (2) waived any actual or potential conflict the Court found. Compare, Pls.' Ex. A–B with supra, n. 9 at 671–72 (listing original twenty-three subpoena targets).

The original subpoena targets that submitted affidavits are: (1) Amerisource Bergen; (2) McKesson; (3) Cardinal Health; (4) Medeo Health Solutions; (5) Wal-mart Stores, Inc.; (6) Kinray; (7) F. Dohmen & Co.; (8) Ahold U.S.A., Inc.; (9) D & K Healthcare Resources, Inc.; and (10) Smith Co.

Of these, Walmart–Stores, Inc., Medco Health Solutions, and Smith Co. have not waived any potential conflict either through affidavit or orally.

**24.** See, e.g., Penner Aff. at ¶¶ 4–5. Ms. Janet Penner of Amerisource Bergen states:

The Company prefers the prompt market entry of generic drugs because, among other things: (a) the Company's percentage markups and profit margins on generic drugs are generally significantly higher than its profit margins on brand name drugs; (b) the Company's working capital and/or inventory carrying costs are significantly lower for substantially less expensive generic drugs; (c) the introduction of generics improves the Company's liquidity; and (d) the Company often can charge for and profit from marketing services for generic drugs, which branded manufacturers typically do on their own. Thus, the entry of generic drugs has historically been, and is currently, positive for both the Company's profit margins and profits.

However, as with the rest of Plaintiffs' evidence, Ms. Penner failed to address the issues as they specifically relate to Hytrin or generic terazosin.

satisfy Rule 23(a)(4). Rather, the purpose of the ordered downstream discovery was to determine if any putative class member benefitted from the alleged anti-competitive conduct. While the Plaintiffs' reading of the Eleventh Circuit opinion is an arguable one, it overlooks the majority of the opinion which appears to treat the recoverable damages (the antitrust measure) and net-benefit (the conflict issue) as separate inquiries. This Court reads the Eleventh Circuit's mandate to require Plaintiffs to show that the class is a homogeneous group of either all net "winners" or "losers." More importantly, should the Court accept any of Plaintiffs' alternative approaches to satisfy the Eleventh Circuit mandate, the ordered downstream discovery of sales, volume, and rebate data would have been an irrelevant academic exercise. Therefore, the Court must conclude that none of the Plaintiffs' approaches satisfies the Eleventh Circuit instructions.

#### 4. Creation of Separate Classes

Finally, the Court notes that the Eleventh Circuit suggested the possibility of certifying two classes, one which consists of members who received a net-benefit, and a separate class consisting of members who enjoyed no such net benefit from the alleged anti-competitive conduct. See Valley Drug, 350 F.3d at 1194, n. 21 ("[t]hose direct purchasers of Hytrin who did not experience a net benefit from the defendants' allegedly illegal conduct are certainly free to pursue a class action on behalf of all similarly situated parties against the defendants ..."). However, with no method, much less one supported by empirical data, to show which type of putative class entity belongs in which class, the creation of two classes devoid of definable similar members fails to resolve the issue of potential conflict. Thus, because class certification is not an automatic entitlement under our rules

of civil procedure, this renewed motion for class certification must be denied.

#### C. Factual Record on Plaintiffs' Alternative Theories

Although they have not met the Eleventh Circuit's requirements, the Sherman Act Class Plaintiffs did present logical arguments to support the conclusion that no fundamental antagonistic interest exists.[25] The Plaintiffs submitted the affidavits of putative class plaintiffs as evidence of the larger national wholesalers' desire to be part of this class. Furthermore, the level of discovery by absent class members shows a willingness and interest in remaining in the class. Finally, notwithstanding the downstream discovery, Defendants cannot articulate any potential or actual conflict or antagonism with respect to economic interests or objectives, or litigation strategy to support the finding that a fundamental conflict exists.

#### 1. Evidence of No Conflict

The putative class members have made affirmative representations that their "interests and objectives" are aligned with the interests and objectives of the class representatives. See, e.g., Valley Drug, 350 F.3d at 1193, 1195 n. 22. The affidavits from the twenty-three putative class members, although insufficient by themselves to satisfy the Rule 23(a)(4) requirement, serve as some evidence of these members' desire to be part of this class. In re Ivan F. Boesky Litig., 120 F.R.D. 624, 625–626 (S.D.N.Y.1988) (noting that "the individual interest of putative class members is respected," and noting that courts must look at "whether the affected class members themselves have any objection to the plaintiffs acting for them in a representative capacity."). The putative class members state that they want to be part of the class. See Pls.' Mot. Exs. A–C.[26] More-

---

**25.** Based on this Court's interpretation of the Eleventh Circuit's instructions, this renewed motion for class certification must be denied. However, if the Court's reading of the opinion is inaccurate, these alternate factual showings may satisfy the Eleventh Circuit's concerns.

**26.** Mr. Scher—representing Amerisource Bergen—stated for the record at the May 21, 2004 oral argument:

> Just in conclusion, your Honor, we swore that there are no conflicts. We didn't say we waive our conflict. We say there are no conflicts between us and the other absent class members. We are in total accord. We want our overcharge damages. Our interests are consistent.
> Or. Ar. at [97:7–11]

over, the affidavits and representations by Amerisource Bergen, Cardinal, and McKesson, the putative class members who suffered approximately 90–93% of this proposed class's purported damages, are evidence that no fundamental conflict or antagonism exists. In these affidavits and representations, these sophisticated putative class members state that they perceive no actual or potential conflict, and to the extent the Court finds such conflict, they waive that conflict. Furthermore, some of these absent class members also appeared at the May 21, 2004 oral argument [27] and have engaged in extensive discovery to comply with the subpoenas. As absent class members not responsible for the prosecution of these claims, this effort displays a significant interest in remaining part of the defined class.

Plaintiffs also note that these same putative class members were members of other class actions where the class counsel in this case represented them and obtained significant recoveries. The wholesalers remained in similar cases alleging illegal acts to delay entry of cheaper, substitutable drugs. *See, e.g., In re Relafen Antitrust Litig.*, 218 F.R.D. 337, 343 (D.Mass.2003) (granting direct purchaser motion for class certification in action that settled for $175 million) [28]; *In re Buspirone Patent Litig.*, 210 F.R.D. 43 (S.D.N.Y.2002) (settling for $220 million dollars); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326 (E.D.Mich.2001) (settling for $110 million dollars).[29] Therefore, based on the affidavits, representations of the large wholesalers and other putative class members, and the history of these class members staying in similar class actions represented by the very same class counsel, the evidence indicates there is no class antagonism or conflict, much less a fundamental one.

### 2. *No Antagonism/ Specific Conflict/ Interest of Absent Members*

The downstream discovery process provided an opportunity to test the Defendants' assertions of fundamental conflicts. Undertaking this discovery was difficult not only because it involved the novel area of downstream discovery of absent class members, but also because of the logistical and mechanical issues that surfaced during the process. While the discovery results do not satisfy this Court's reading of the Eleventh Circuit opinion, they do indicate that the marginal benefit, if any, between pre and post generic entry for the largest wholesalers was slight. Based on the evidence in the record, it would appear that such net benefit would not present an opportunity for fundamental conflict to arise.

Examining the record further, the Court finds no hard evidence of an actual disagreement or conflict nor can it imply that a realistic possibility of fundamental antagonism exists. *Compare Miles v. Metro. Dade County*, 916 F.2d 1528, 1534 (11th Cir.1990) (citation omitted) *with Bradburn Parent/Teacher Store, Inc. v. 3M (Minnesota Mining and Manufacturing)*, 2004 WL 414047 at *8–9 (E.D.Pa. March 1, 2004) (noting that some of the largest members of the class would not benefit from pursuing an overcharge theory but would rather be harmed by it and that some members of class questioned whether Defendants' conduct was illegal). Here, no putative class member opposes the class, no class member has articulated any possibility for conflict or antagonism, and the class members constituting over 90% of the alleged overcharge damages affirmatively state that they want to be part of the class. Pls.' Mot at 1. In this action,

---

Mr. Long—representing Cardinal Health—stated:
I have spoken with my client during the break. I am authorized to state on the record that if this Court were to perceive any conflicts as was included in our other affidavits between the named representatives and Cardinal, Cardinal will waive those conflicts.
*Id.* at [185:18–22].

**27.** Representatives of Amerisource Bergen, Cardinal Health, McKesson, Medco, and Burlington Drug Company appeared, at their own expense, at the May 21, 2004 Oral Argument. Or. Ar. at [25:11–23].

**28.** Judge Young concluded that there was no conflict between class counsel and direct purchaser class members and that class counsel had vigorously prosecuted the case. *Relafen*, 218 F.R.D. at 343.

**29.** These figures are based on Plaintiff counsel's representations to the Court. Or. Ar. [33:15–19].

the smaller regional wholesalers are prosecuting this case on behalf of large national wholesalers. The larger wholesaler putative class members express satisfaction with the prosecution of this action. There has been no factual showing that there is a real divergence of economic or litigation interest among the class members or between the named class representatives and the class in this particular action. Further, the rights of absent class members will not be sacrificed or diminished, and advancing the interests or maximizing the recovery of one member or subset of members will not sacrifice the rights or diminish the recovery of any other class member or members. *Valley Drug,* 350 F.3d at 1189.

Defendants, nonetheless, assert that a conflict exists. However, hard evidence does not support the Defendants' assertions, and Defendants have been unable to show any actual disagreement or conflict that would sacrifice the interests of some class members for that of others nor have they identified any harm to any putative class member as the result of pursuing this lawsuit. The Court questioned Abbott's counsel several times as to whether they could articulate the specific, divergent interests or antagonism that would offend Rule 23(a)(4). *See* Or. Ar. at [118:5–14; 126:3–15]. Counsel for Abbott responded: "[f]or example, if you have parties that were actually not harmed out of pocket, actually benefitted, might they approach the case differently than parties who need to be compensated for actual losses? Might they have a different position on settlement? They might. And this is part of the reason you don't get into the speculation." Or. Ar. [123:21–124:1]. At this stage of the case, there needs to be more than Defendants' speculation and postulations to establish a fundamental conflict. *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130,* 657 F.2d 890, 895 (7th Cir.1981) ("[t]his is a bit like permitting a fox, although with pious countenance, to take charge of the chicken house.").

Except for the Plaintiffs' failure to comply with the Eleventh Circuit's directions to determine net "winners" and "losers" to ensure a homogeneous class to avoid any potential unforeseen conflict, the Court does not find a realistic possibility for fundamental antagonism. The economic realities, factual circumstances, and superior efficiency seem to support the certification of this class, but. the clear mandate of the Eleventh Circuit requires denial of the renewed motion. Thus, because Plaintiffs fail to satisfy Rule 23(a)(4), it is hereby,

ORDERED that the Sherman Act Class Plaintiffs' Renewed Motion for Class Certification, [D.E. 1113], is DENIED.